773 A.2d 463

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND,

v.

Susan K. VANDERLINDE.

No. 15, Sept. Term, 2000.

Court of Appeals of Maryland.

June 6, 2001.

Melvin Hirshman, Bar Counsel and Gail D. Kessler, Assistant Bar Counsel for the Attorney Grievance Com'n of Maryland, for petitioner.

Pamela A. Bresnahan, Washington, DC, for respondent.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

CATHELL, Judge.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition for disciplinary action against Susan K. Vanderlinde, respondent, for violation of the Maryland Rules of Professional Conduct (MRPC). The petition alleged that the respondent violated the provisions of MRPC 8.4 Misconduct. That rule provides:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(e) state or imply an ability to influence improperly a government agency or official; or

(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

There is no dispute about the facts of the misconduct. The respondent, over a period of time, while working outside of the profession of law, took (embezzled, stole, misappropriated) $3,880.67 from her employer, King's Contrivance Community Association (Association). She used the money for her own purposes. The thefts continued even after she had given her employer notice that she would be resigning to accept a legal position with a law firm. She had replaced the monies by the time of the cessation of her employment, and her thefts initially remained undetected by her employer. At the hearing in the Circuit Court, she admitted that she had violated the provisions of Articles 8.4(a), 8.4(b), and 8.4(c) of the MRPC.

Given that respondent has freely acknowledged that on many occasions over a period of time she misappropriated money of the Association for her own use, the details or methods used by her to effect the thefts is not directly at issue, and it is not necessary that we describe those details. The case she presents to this Court in her defense goes exclusively to mitigating factors.[1] Essentially, she asserts that the pressures of her life and the impairment of her mental faculties, including her periods of depression, mitigate against severe sanctions for the offenses she admits committing. Accordingly, we shall address those concerns, then discuss the history of the cases of this Court where similar problems have been proffered as mitigation in disciplinary matters. We shall then declare and reiterate once again the current position of the Court in respect to the appropriateness of using such matters to mitigate findings or sanctions in cases involving theft, misappropriation or other forms of dishonest

---

**1.** Respondent refers to certain matters that are not a part of the record before the Court. That is inappropriate and we will not address such matters. Were we to address them, it would not affect the resolution the Court reaches.

conduct. Finally, we shall consider the sanctions to be imposed in this case in light of the positions declared and reiterated by the Court.

## Mitigation Claims

At the hearing in the Circuit Court, Judge James C. Cawood, Jr. found:

Respondent certainly had difficulties. Her second marriage failed and her lucrative practice with USF & G was eliminated in the early 90s. She took a series of non-legal jobs, including KCCA, that provided relatively little money. She was having financial difficulties at the time she started taking the funds. Ironically, she is now earning $80,000.00 per year as a lawyer.

The obvious question in this case is mitigation. Respondent presented Dr. Blumberg and petitioner presented Dr. Tellefsen to speak on Respondent's condition. Both are extremely knowledgeable in this field. Both believe that she knew what she was doing was wrong, and that she did it of her own free will. Both indicated that Respondent has, at a minimum, a personality disorder and was mildly to moderately depressed. Dr. Blumberg believes she acted as she did because of her mental disorder.

We have little doubt that Respondent was depressed because of problems in her personal and professional life, and that her psychological make-up contributed to her problems. However, she took this money in this case because she needed it and because she thought she would not be discovered. She could control her conduct, and could have made a conscious effort to do otherwise. While we can understand her situation, her misconduct cannot be primarily attributed to any disorder.

That does not mean that there is no mitigation in this matter. Although misusing monies[2] is always wrong, and

---

**2.** The hearing judge uses the term "misusing" money. Respondent was using money to pay her bills. Generally, the paying of bills is a proper

the Association was probably a vulnerable institution, the amount taken was not huge, and it was restored before the investigation. We believe remorse is genuine, both because of the extreme financial impact disbarment will have on her [3] and because she has had to face that what she had done is a criminal and unethical act. We have no doubt she would be amenable to any counseling ordered for her, and would conscientiously attend any sessions. Whether that is sufficient to avoid disbarment is entrusted to the judgment of the Court of Appeals.

Accordingly, it is this 27th day of December, 2000

. . .

DETERMINED that Respondent was ma[d]e more susceptible to such actions by her personality disorder but knew her conduct was wrong and acted of her own free will.

Respondent took several exceptions to the hearing judge's findings, which we shall now address seriatim, prior to addressing the other areas we have mentioned and ultimately determining the appropriate sanction.

Respondent, in her first numbered paragraph, makes two exceptions, first, to the fact that the hearing court did not "make an express finding of fact that Respondent's depression is a mitigation circumstance which justifies a sanction less than disbarment" and, second, that "Judge Cawood did not make a specific finding that Ms. Vanderlinde suffered from dysthemia." In respect to the first exception above, it is overruled. It is not the hearing judge's function to determine

---

use of money. Using money that belongs to another, without permission, is stealing, not misusing.

**3.** This finding of "remorse," in essence, is that respondent will be sorry if she is disbarred because it will cause her financial difficulties. *The Random House Dictionary of the English Language* 1214 (Unabridged Edition 1983) defines "remorse" as: "**1.** deep and painful regret for wrongdoing; compunction. **2.** *Obs.* pity; compassion. . . . **Syn. 1.** contrition." We doubt that the effect of financial difficulties on a wrongdoer caused by the discovery of the wrongdoing would ever constitute genuine remorse.

whether a finding of mitigation "justifies a sanction less than disbarment."

In respect to the second exception, it is overruled. If it were not overruled, it would make no difference in respect to the violations of the respective rules. Respondent admitted violating the rules. Likewise, given our discussion of sanctions, *infra*, and our determinations in that regard, whether the hearing court made a specific finding as to dysthemia, would not affect the sanction the Court imposes. Moreover, as we indicate, *infra*, a hearing court is not required to mention every evidentiary matter in its finding.

For the same reason first described above, we overrule respondent's exception contained in paragraph two. The hearing court must make findings in regards to facts that it believes mitigate in respect to the conduct of a respondent in attorney discipline matters, but it is not authorized to make findings that "a mitigating circumstance ... justifies a sanction less than disbarment." Its function is to bring what it believes to be mitigating circumstances, in respect to the conduct involved, to the attention of this Court, not to offer its views as to whether any such circumstance, or the lack of any such circumstances, justifies any lesser or greater sanction.

In paragraph three, respondent excepts to Judge Cawood's findings "to the extent that Judge Cawood did not take into consideration Respondent's medical condition, Cavernous Vascular Malformation." While it is not entirely clear, it appears that this exception is based on the fact that the disease, Cavernous Vascular Malformation, is not mentioned in Judge Cawood's findings of fact and conclusions of law. We initially note that there is nothing in the findings, or the memoranda of the parties, that indicates that Judge Cawood did not consider the disease (or condition) in question. There is certainly nothing that we can find that indicates that Judge Cawood rejected the proffer, or the medical opinions of Drs. Blumberg and Tellefesen that respondent suffers from the condition. Nor is there any indication that Judge Cawood rejected the medical evidence that such a condition, in respon-

dent's case, was " 'an anvil over her head' that is an additional stressor for her at all times." Exceptions to the findings of our hearing judges in attorney discipline matters should be directed to facts that he finds, or facts that he expressly rejects or expressly refuses to consider. The mere failure to mention a particular fact in its findings, normally is not the equivalent of failing to consider it. Our attention has not been directed to where in the record Judge Cawood either rejected the evidence that respondent had the condition, or expressly refused to consider whether she had the condition.

■■ Our hearing courts' duties are to consider all evidence properly submitted in the discipline process. Absent indications that such evidence is not considered, we presume it was considered along with all the other evidence. We reiterate what we said in *Attorney Grievance Commission v. Miller,* 301 Md. 592, 606–07, 483 A.2d 1281, 1289 (1984):

The fact that this testimony was not specifically discussed in the court's finding does not indicate a failure to consider it. Moreover, the court was free to disregard this evidence if it was not credible. The reception of evidence is to a large degree entrusted to the discretion of the trial judge and will seldom be reversed. [Citations omitted.]

Again, we also point out that respondent has admitted that she committed the violations at issue here (and the evidence fully supports that she committed such violations). In any event, in light of our subsequent discussion and determinations, the issue of whether respondent has the condition, would not affect our imposition of sanctions. Accordingly, this exception is overruled.

■ Respondent next excepts to the finding where Judge Cawood determined that she "took the money because she thought she would not be discovered." First, the evidence does support that she utilized a method of taking the money designed to conceal her conduct, and to conceal the thefts. In at least some cases, she concealed from her employer that checks were not being deposited. When the payer on the check would call the office to inquire why the check had not

cleared, the contact person was the respondent. She would then present the check for payment to conceal that she was holding back checks as a part of her scheme to misappropriate cash. She kept deposit slips in her briefcase, rather than in the files of the Association. She would only misappropriate the cash items that were to be deposited, because she had sole control over that deposit process. She never stole from the petty cash fund because others had access to it, and missing money might be discovered.

In any event, evidence of the stealing of money in a surreptitious manner supports a finding that a thief believes that, or hopes that, he or she will not be discovered. There was no evidence that would support even an inference that respondent believed or hoped she would be discovered. Additionally, in view of the discussion and determinations that follow, whether respondent believed she would or would not be discovered, is not relevant to the matter of sanctions. As we have indicated, respondent has admitted the violations. This exception is also overruled.

We hold that respondent has violated the provisions of MRPC 8.4 sections (a), (b), and (c) discussed *supra*.[4] We now direct our attention to the matter of sanctions.

## Discussion

Respondent, in her exceptions and recommendations as to sanctions, discusses at length her mental history. There is no assertion by Bar Counsel that she has misinterpreted that history as supported by the evidence before Judge Cawood. We shall accept, therefore, that it is accurate.

We are first told that respondent has a history of depression, beginning from her undergraduate college years, continuing to the present. During law school, she sought treatment for it after the death of her husband. She sought treatment for it again in 1989 after her second marriage began to deteriorate. From 1989 until 1994, she was treated on almost

---

4. She was not charged with violating MRPC 8.4(d).

a weekly basis. During that period, she was diagnosed with a dysthymic disorder, mild to chronic long lasting depression, and a mixed personality disorder. The depression improved over a period of several months.

After she was terminated from a job with the Jackson Foundation in 1996, she again became depressed.. During the ensuing period, she was unable to find work as an attorney and was unsuccessful at selling real estate. Additionally, she was embarrassed by her difficulties. At the same time, unknown to her, her eldest daughter was suffering from depression.

There is evidence in the record that Dr. Blumberg found that during the period when the misconduct at issue occurred, respondent was "under acute stress and suffered from dysthemia." Dr. Blumberg found that respondent's condition "significantly impaired her judgment" and "was a root cause of the misconduct." He described her conduct as being "very much out of character for her." Dr. Tellefsen did not agree that her mental condition was a root cause of her conduct. Both Drs. Blumberg and Tellefsen testified that she knew that her conduct was wrong and that she could have controlled that conduct.

In her briefs to and oral argument before this Court, respondent likens her situation to situations involving attorneys who have been the subject of disciplinary matters, in which, in the past, we have considered alcohol and drug problems in respect to mitigation of sanctions.[5] In essence, respondent argues that where there is a finding that an attorney's conduct is, in whole or in part, a result of a mental condition that affects her or his actions, the Court should recognize a new mitigation circumstance that warrants less than a serious sanction.[6]

---

**5.** As we indicate, *infra*, the Court has, in recent years, been reconsidering the extent to which we will consider such matters in cases involving dishonesty, theft, misappropriation, etc.

**6.** In the present case, the hearing judge expressly found that respondent, in spite of her mental condition, was able to control her conduct.

Accordingly, as respondent relies on those prior cases, we shall review, insofar as it is possible to do so, how they have evolved down to the present. As we do, we will keep in mind, especially in cases of dishonesty, intentional misappropriation, fraud, serious criminal offenses, and the like, that our primary function always is to protect the public, *not attorneys*, and that respondent's claim that her mental impairment should mitigate sanctions in her favor presents us with the ancillary question, perhaps an unanswerable question, of whether the public would be better protected by a sanction that would permit a mentally impaired, dishonest lawyer to eventually return to practice or a mentally sound, dishonest lawyer to eventually return to practice.

---

The evidence supported that finding. He declined to find that her mental condition was the root cause of the misappropriation. He agreed with Dr. Tellefsen in that regard. Nonetheless, we shall address the issue. We shall attempt to resolve it in this case, keeping in mind that the primary function of the sanction process is, in the first instance, to protect the public. "The purpose of disciplinary proceedings against an attorney is to protect the public rather than to punish the erring attorney." *Attorney Griev. Comm'n v. Hamby*, 322 Md. 606, 611, 589 A.2d 53, 56 (1991). "The disbarment of an attorney protects · the public not only from being further victimized by the attorney himself, but also, ... 'because it demonstrates to members of the legal profession the type of conduct which a court will not tolerate,' and is necessary 'to preserve the integrity of the legal and judicial system of Maryland.' " *Attorney Griev. Comm'n v. Kahn*, 290 Md. 654, 683, 431 A.2d 1336, 1351–52 (1981) (internal citations omitted). " '[T]he duty rests upon the courts, and the profession as a whole ... to protect the public from imposition by the unfit or unscrupulous practitioner....' " *Klupt v. Bar Ass'n of Baltimore City*, 197 Md. 659, 664, 80 A.2d 912, 914 (1951), quoting *Rheb v. Bar Ass'n of Baltimore*, 186 Md. 200, 205, 46 A.2d 289, 291 (1946); *see Attorney Griev. Comm'n v. Clark*, 363 Md. 169, 183–84, 767 A.2d 865, 873 (2001); *Attorney Griev. Comm'n v. Shaw*, 363 Md. 1, 12, 766 A.2d 1028, 1034 (2001); *Attorney Griev. Comm'n v. Cassidy*, 362 Md. 689, 698, 766 A.2d 632, 637 (2001) ("[T]he purpose of sanctions—to protect the public; to protect the integrity of the legal profession, and to deter other lawyers...."); *Attorney Griev. Comm'n v. Zdravkovich*, 362 Md. 1, 31, 762 A.2d 950, 966 (2000); *Attorney Griev. Comm'n v. Koven*, 361 Md. 337, 343, 761 A.2d 881, 884 (2000); *Attorney Griev. Comm'n v. Briscoe*, 357 Md. 554, 567, 745 A.2d 1037, 1043–44 (2000); *Attorney Griev. Comm'n v. Garland*, 345 Md. 383, 397, 692 A.2d 465, 472 (1997).

In the case at bar, respondent urges us to examine mental impairment unrelated to alcohol abuse in the same context as when we have found mitigating circumstances arising out of alcoholism. Respondent's contention collaterally presents the issue of whether the public is better protected by mitigating sanctions in the case of alcohol or drug addicted lawyers who violate the rules of conduct, but not mitigating sanctions in the case of misconduct by unabusing and unaddicted attorneys. The Court, in its internal discussions on this matter and in cases we shall describe *infra*, has already been reassessing the appropriateness of using alcoholism and other substance abuse as factors to be considered in the mitigation of sanctions in cases involving dishonesty, given that the primary role of the process is to protect the public. We recently determined to strictly scrutinize such factors and to apply them in mitigation only in cases where such problems are extraordinarily compelling. There appears to have evolved over the years a logical inconsistency where lesser sanctions were imposed if an attorney was prone to addiction (or mental impairment for that matter), than if he or she was not, *if indeed the primary purpose of sanctions in the first instance is to protect the public.* It might be otherwise, *i.e.,* more consistent, if the primary purpose of the process was to punish the attorney. A related question is whether, logically, mitigation should apply to findings relating to conduct, or relating to sanctions to be imposed after a finding of misconduct, or relating to both, or neither. We shall attempt to resolve at least some of the above questions in our discussions in the present case. In the process, our position, hopefully, will become clearer to members of the bar—that the protection of the public is still the paramount concern.

## The Modern Evolution

Early in the last half century, we noted our special concerns in regards to disciplinary matters involving dishonest conduct not arising out of an attorney's professional conduct, when we rendered a decision in which we disbarred an attorney for using slugs in parking meters. *Fellner v. Bar Ass'n of Baltimore City,* 213 Md. 243, 131 A.2d 729 (1957). Unlike the

present case, there were no claims of mental impairment affecting Fellner's conduct. We noted:

"The Maryland statute ... which contains ... the phrase *'conduct prejudicial to the administration of justice,'* delegates or confirms to the courts the power and duty to consider particular conduct of one who is an officer of the court, in relation to the privileges and duties of a public calling that specially invites complete trust and confidence. We decline to give to the phrase last quoted a restricted meaning. In the last analysis the duty rests upon the courts, and the profession as a whole, to uphold the highest standards of professional conduct and to protect the public from imposition by the unfit or unscrupulous practitioner." [7]

7. The then controlling statute also contained a phrase providing that crimes of moral turpitude also constituted misconduct. Over the years, the statute has metamorphosed into MRPC 8.4, discussed, *supra*. In the present case, we do not have to address whether misrepresentations in relation to matters other than the actual practice of law, such as in this case, might also constitute a violation of the trustworthiness standards of (b), in respect to criminal acts that might formerly have met the standards of "crime involving moral turpitude" contained in the statute out of which the current MRPC evolved. In 1987, with the adoption of the then new MRPC, direct references to crimes of moral turpitude were eliminated. In *Attorney Grievance Commission v. Casalino,* 335 Md. 446, 450–51, 644 A.2d 43, 45 (1994), we said:

Respondent contends that tax evasion is not a crime of moral turpitude *per se,* and that in any event, moral turpitude ceased to be an enumerated factor in disciplinary proceedings upon replacement of the former Maryland Code of Professional Responsibility ... on January 1, 1987. We uphold this exception in part and reverse it in part. We hold that tax evasion is indeed a crime of moral turpitude, but agree that moral turpitude is no longer a factor in disciplinary proceedings.... [A] crime's status as one of moral turpitude is irrelevant to whether a lawyer has been guilty of the misconduct proscribed by that rule. Under the current rule, a lawyer's commission of a crime or conduct enumerated in Rule 8.4 will subject that lawyer to discipline irrespective of whether the crime is *also one of moral turpitude.* [Emphasis added.] [Footnote omitted.]

When the change was made in 1987, the comment to the new MRPC 8.4, in explaining the deletion of the provisions relating to moral turpitude, stated in part "a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, or breach of trust, or serious interference with the administration of justice are in

*Id.* at 247, 131 A.2d at 731 (emphasis added), quoting *Rheb v. Bar Ass'n of Baltimore,* 186 Md. 200, 205, 46 A.2d 289, 291 (1946). In *Rheb,* 186 Md. at 205, 46 A.2d at 291, we went on to note:

> As was said by Lord Mansfield long ago: "The question is, whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion. * * * It is not by way of punishment; but the court, on such cases, exercise their discretion whether a man whom they have formerly admitted is a proper person to be continued on the roll or not."

In *Prince George's County Bar Association v. Vance,* 273 Md. 79, 327 A.2d 767 (1974), a case where an attorney, rather

---

that category." In *Casalino,* our holding was that moral turpitude was no longer a requirement in respect to finding criminal conduct to warrant disciplinary proceedings, not that the commission of some types of offenses of moral turpitude could not, under certain circumstances, be the basis for such proceedings arising under the generalized prohibitions of the then new disciplinary rules, such as Rule 8.4(b)—committing a criminal act reflecting adversely on the lawyers trustworthiness and fitness to practice, 8.4(c)—engaging in misrepresentations, and 8.4(d)—engaging in conduct prejudicial to the administration of justice. With the change, offenses of moral turpitude no longer stood alone. Certain offenses of moral turpitude remain offenses because of the specific provisions of the new rule, *i.e.,* 8.4 sections (b) and (c) where certain crimes of moral turpitude are also criminal acts or relate to honesty, etc. Perhaps other offenses not specifically described in 8.4(b) and (c) remain relevant as factors to be considered in respect to 8.4(d). We note that in our earlier cases, we considered all such offenses, generally to be "prejudicial to the administration of justice." *See Fellner,* 213 Md. at 247, 131 A.2d at 731; *Rheb,* 186 Md. at 205, 46 A.2d at 291.

Additionally, in a case decided almost a year and a half after the change of the rules, and six years before *Casalino, supra, Attorney Grievance Commission v. Sparrow,* 314 Md. 421, 430, 550 A.2d 1150, 1154 (1988), a reciprocal case, we still applied vestigages of the prohibition against crimes or acts of moral turpitude. We said: "Thus, we see that when a crime or act of moral turpitude involving fraud or dishonesty is implicated, disbarment is the sanction absent compelling extenuating circumstances; but where there is no moral turpitude, mitigating factors of lesser magnitude may be considered in determining the appropriate sanction." Thus, we still, after the change in the rules, recognized a place for "moral turpitude" in the attorney disciplinary process.

than directly stealing, forged military documents in order to enable him to utilize a post exchange privilege that netted him $1.00, and where the hearing court had recommended a reprimand, but where we imposed a suspension sanction, we stated:

> In view of respondent's concession that he committed the act alleged, it matters little that the charges were not actually prosecuted to their conclusion, and that he has not been convicted of a crime. In other words, in terms of whether the charges of misconduct have been sustained, so as to subject him to a possible sanction, his admission in these proceedings just as effectively establishes such conduct as would a final judgment of conviction, in a criminal case, filed under Rule BV4 f 1. . . .

> . . .

> Nor, however, is this properly a case for a bare reprimand, let alone an outright dismissal of these proceedings. . . . However minimal the amount involved may have been, the inescapable fact remains that respondent's acts were the fruits of misrepresentation; moreover, they were studied, not impulsive. . . . Though not committed in a professional capacity, the actions of respondent nevertheless reflect directly upon his fitness as an attorney.

*Id.* at 83–85, 327 A.2d at 769–70 (citations omitted).

*Attorney Grievance Commission v. Silk,* 279 Md. 345, 369 A.2d 70 (1977), was another of the earlier cases where we held that conduct outside of the practice of law could, nonetheless, constitute misconduct warranting sanctions. We noted that Silk had not been prosecuted for his misappropriations, that he had consented to the entry of a judgement against him in respect to the stolen funds, that he had paid the judgment, that he was contrite and remorseful, and that he was a state employee who had a very limited private practice. We then addressed the issue of whether a misappropriation of funds that occurs outside of the practice of law (as in the instant case) should be treated more leniently than the misappropriation of funds occurring within a law practice. We said:

" . . . [W]e see no significant moral distinction between willfully defrauding and cheating for personal gain a client, an individual, or the government. The professional ethical obligations of an attorney, as long as he remains a member of the bar, are not affected by a decision to pursue his livelihood by practicing law, enter[ing] the business world, becoming a public servant, or embarking upon any other endeavor."

In light of what has been said in the cases cited, there appears to be no sound reason for regarding misappropriations committed in a non-professional capacity more leniently than those committed in a professional capacity. Each involves a breach of trust or of a fiduciary relationship and bear equally on the fitness of a lawyer to practice his profession.

*Id.* at 348, 369 A.2d at 71, quoting *Maryland State Bar Association v. Agnew,* 271 Md. 543, 550, 318 A.2d 811, 815 (1974). *See also Attorney Grievance Commission v. Lazerow,* 320 Md. 507, 578 A.2d 779 (1990).

One of the first cases in which the health of a respondent was an issue, albeit collaterally, and then it was a physical condition, was the case of *Bar Association of Baltimore City v. Siegel,* 275 Md. 521, 340 A.2d 710 (1975), cited by respondent in the present case. In that case, we considered the issue of physical condition, to the extent it was a mitigatory factor, as to the offense itself, not as to the appropriate sanction.

*Siegel* was a tax evasion case. In the underlying case, Siegel had pled *nolo contendere.* In the disciplinary proceeding, Siegel proffered as one of several mitigating factors that his plea in the underlying case had, in part, resulted from his physical condition at the time of that trial. We noted:

Thirdly, Mr. Siegel urges that his nolo contendere plea was largely, if not exclusively, the result of his extremely poor health—two massive heart attacks—which he suffered after he was indicted for tax fraud. We responded to this same contention when it was made under like circumstances

in *Maryland St. Bar Ass'n v. Callanan,* [271 Md. 554, 557, 318 A.2d 809, 810 (1974) ], where we decided that while the "health problem is distressing ... we conclude that since [it] ... developed or occurred *subsequent* to his criminal activity ... [this coronary malady does] not serve to palliate the evil of his offense."

...

... On the other hand, we cannot accept as "compelling extenuating circumstances" those proffers by the respondent which in essence call upon us to assess the integrity of the criminal conviction itself—that prior adjudication is conclusive and thus cannot be attacked in a disciplinary proceeding by invoking this Court to reweigh or to re-evaluate the respondent's guilt or innocence.[8]

*Id.* at 526–27, 340 A.2d at 713 (some alterations in original). We then disbarred Siegel noting: "Since the respondent was convicted of a crime involving moral turpitude, and no sufficient and compelling mitigating circumstances were presented in his behalf to justify the imposition of a lesser sanction, the name of [the respondent] will be stricken from the rolls of those authorized to practice law in this State." *Id.* at 529, 340 A.2d at 714.

The next case in which we addressed health factors in a case involving a mental condition, was *Bar Association of Baltimore City v. McCourt,* 276 Md. 326, 347 A.2d 208 (1975), where the mental problem was apparently unrelated to alcohol or drug abuse. The panel, which was the hearing court at that time, found that, when Mr. McCourt had been convicted

---

**8.** We were responding to a particular statute or rule, Rule BV4 f 1, that provided in disciplinary matters that a prior conviction was conclusive as to the conduct there involved. The same provision is contained in the present Rules. In other words, mitigation arising out of allegations of adverse health, could not be used to assess the culpability of the actors conduct in committing offenses for which one was convicted. Over time, as a result of this case, and perhaps other cases, mitigation began to be addressed to matters of sanction, although, it still, in present time, is an attempt to excuse, in full or in part, the conduct, and by reason of excuse for the conduct, reduce the sanction.

of failing to file income tax returns, the sentencing court in his criminal trial had considered that, at the time of the offense:

Respondent had a neurotic personality disorder, medically classifiable as a " * * * passive-aggressive personality, passive-dependent type." ... [S]uch a " * * * personality disorder is characterized in the patient by emotional immaturity and dependency, procrastination and avoidance of unpleasant reality, hedonistic pursuits and difficulty in handling hostile, rebellious and other negative emotions." Notwithstanding these manifestations of the disorder ..., Dr. Rothstein concluded that " * * * at the time ... Mr. McCourt did not lack the capacity to appreciate the wrongfulness ... or strictly speaking, to conform his conduct to the requirements of the law."

*Id.* at 330–31, 347 A.2d at 210. The hearing panel, "[i]n light of this and in considering the other factors proffered in mitigation," recommended a year's suspension. *Id.* at 332, 347 A.2d at 211. We accepted that recommendation.

Standing alone, the language of that hearing panel does not indicate whether McCourt's mental problems caused the panel to recommend a lesser sanction; it merely states that it considered "factors proffered in mitigation." *Id.* We, however, apparently thought that the panel in *McCourt* had recommended a lesser sanction due to McCourt's mental problems, because, subsequently, in *Attorney Grievance Commission v. Walman,* 280 Md. 453, 466, 374 A.2d 354, 362 (1977), a case in which the mental condition of Walman was not at issue, we commented: "This case therefore lacks the mitigating circumstances found in [*McCourt*], in which the testimony of a psychiatrist revealed that the criminal conduct was related to a 'passive-aggressive' neurotic personality disorder."

*McCourt,* and the mention of *McCourt* in *Walman,* are the only two early references to mental conditions, standing alone as mitigation, of which we are aware.

An attorney could not account for all of the funds arising out of several real estate settlements in *Attorney Grievance Commission v. Cooper,* 279 Md. 605, 369 A.2d 1059 (1977).

*Cooper* is one of the first cases in which the mental condition of an attorney *arising out of alcohol or drug addiction,* was considered in determining sanctions. However, it is unclear from the opinion whether Cooper was given a more lenient, or more serious, sanction because of those allegedly mitigatory factors. He was placed on the inactive list because he was then presently incompetent to practice. As required at the time, a three-judge panel made a recommendation for an indefinite suspension. In its recommendation the three-judge panel noted:

> In recommending a sanction in this case we have considered the condition of the respondent's health during the period of the misconduct....
>
> We have no doubt that the physical infirmities which are described in the medical records ..., have been materially contributed to by his chronic alcoholism which substantially pre-dates the misconduct in question.... His appearance and demeanor as a witness before us confirms the disintegration of his mind and body which has followed this alcohol abuse.
>
> Because we believe his misconduct was principally the result of his inability to render, ... "adequate legal service by reason of mental or physical illness or infirmity, or addiction to or dependence upon an intoxicant or drug", and because we are convinced that this incompetency continues at this time we recommend ... that the respondent be placed on an inactive status as provided for in Maryland Rule BV11 a 2.

*Id.* at 612, 369 A.2d at 1062 (citations omitted). It is not possible from the language of the three-judge panel's recommendation to determine whether they recommended a harsher sanction, or a more lenient sanction, because of the mental conditions caused by Cooper's drinking and drug problems. This Court merely accepted the recommendation of the panel without substantive comment.

We next considered the effect of mental and physical health problems caused, at least in part, by alcohol abuse, in the

context of attorney disciplinary matters, in a case with some similarity to the facts in the case at bar. *Attorney Grievance Commission v. Flynn,* 283 Md. 41, 387 A.2d 775 (1978). The process then in place still required hearings before a trial court level judicial panel that made recommendations to this Court. The panel had found that Flynn had committed several instances of misconduct, including using client's funds " 'for [a] purpose other than the purpose for which such funds were entrusted to him.' " *Id.* at 44, 387 A.2d at 777 (alteration in original). We there stated:

That this Court takes a very dim view of members of the bar who at the expense of their clients elect to feather their nests should by now be plain to all. Thus, absent compelling extenuating circumstances, present and associated with the illegal or improper acts at the time committed, when an attorney engages in conduct which entails dishonesty, as we determine is true in the present case, that attorney will be disbarred as a matter of course to protect the public from being victimized by his further dishonesty.

In this case, after reviewing the record with meticulous care, we have concluded that there did exist serious physical and mental illness at the time of the commission of the dishonest and otherwise improper acts, which, while not excusing them, was to a substantial degree causally connected and is sufficiently exculpatory that it warrants our not imposing the ultimate sanction of disbarment; instead we will order a sanction that is a smidgeon less severe— suspension from the practice of law in this State for an indefinite time period. . . .

*Id.* at 45, 387 A.2d at 777–78 (citations omitted).

We then gave our reasons for departing from the otherwise appropriate sanction of disbarment. For six years after being admitted to the bar, the respondent had been a highly competent and successful attorney, held in high esteem by fellow members of the bar and members of the bench. Beginning in 1971, and over the next five or six years, his competence gradually deteriorated, and "he was transformed from a highly motivated, orderly, and competent attorney into a morose,

alcoholic individual, despondent to the point of being suicidal, who neglected his law practice...." *Id.* at 46, 387 A.2d at 778. During the same time span, he was divorced, had problems with his teenage son, and spent most of his time getting drunk. At the time of his misconduct, he was closing his law practice in order to take up a less demanding line of work. We imposed an indefinite suspension, rather than a disbarment, with some cautionary language in reference to the difficulty that the respondent might have in attempting to get his suspension lifted. Thus, in *Flynn*, as we did in *Cooper*, we imposed less than the sanction of disbarment in cases where the attorneys had been experiencing mental and/or physical problems resulting, at least in part, from alcohol and drug abuse. *See also Attorney Grievance Commission v. Burka,* 292 Md. 221, 438 A.2d 514 (1981).

In the period between the early cases of *Flynn* and *Cooper*, and the early 1980s, the Bar Association began to stress rehabilitation of alcohol abusing attorneys and to eventually put in place procedures to aid in that rehabilitation. That fact, among others, apparently led to the beginning of our stressing of rehabilitation in respect to attorneys experiencing alcohol or drug related problems affecting their practices, even sometimes when the resulting problems involved the misappropriation of money.

The initial cases in that respect were *Attorney Grievance Commission v. Bailey,* 286 Md. 630, 408 A.2d 1330 (1979), and *Attorney Grievance Commission v. Finlayson,* 293 Md. 156, 442 A.2d 565 (1982). In *Bailey,* no dishonest or fraudulent intent was found. We noted that had there been clear evidence that Bailey had intended "to steal or consciously misappropriate the funds in question, we would disbar." *Bailey,* 286 Md. at 636, 408 A.2d at 1333. Accordingly, *Bailey* is not directly comparable to cases in which an intent to steal or misappropriate is found and sanctions less onerous than disbarment imposed because of alcoholism. *Bailey,* however, is the first case in which we noted the existence of Bar Association pressure to consider rehabilitation efforts in mitigation of conduct and/or sanctions. We said:

The case here undoubtedly is one of the types of situations which the Maryland State Bar Association had in mind when it suggested to us in October of this year that consideration be given to a lawyer counseling committee concept.... This concept is still under study. Thus, it is not available in this particular proceeding.

*Bailey,* 286 Md. at 637, 408 A.2d at 1334.

We then suspended Bailey, but provided that he could seek to have the suspension lifted after thirty days, provided he met certain conditions, stating as to those conditions: "It is for this reason we impose the condition which we do. It is as close as we are able to come ... to the type of counseling which the ... Association earlier recommended." *Id.* at 638, 408 A.2d at 1335.

In *Finlayson,* we noted in the first sentence of our opinion: "We shall attempt ... to use procedures directed at rehabilitation ... which are similar to those we tried, albeit unsuccessfully, in [*Bailey* ]." *Finlayson,* 293 Md. at 156, 442 A.2d at 566. *Finlayson,* also, is not directly on point with the instant case, and similar cases involving dishonesty or misappropriation. All of the charges in *Finlayson* involved allegations of neglect. As in *Bailey,* we suspended Finlayson, with the right to seek reinstatement immediately upon the satisfaction of conditions, including rehabilitation measures which, since *Bailey,* had become available.

Neither *Bailey* nor *Finlayson*[9] are directly on point, in that, although both involved problems created by alcoholism, neither were cases in which intentional dishonesty, stealing, or misappropriations were found to have occurred. It is interesting to note that the reliance on post-finding alcoholism rehabilitation as a considered mitigating factor began in cases involv-

---

9. Finlayson was suspended with the right to reapply immediately for readmission. The damage he did to his law partnership by his negligent conduct, however, resulted in his partner, in an effort to keep the practice afloat, committing violations of the disciplinary rules, including co-mingling of client's funds with personal funds, which resulted in the partner's disbarment two years later. *See Attorney Grievance Commission v. Velasquez,* 301 Md. 450, 483 A.2d 354 (1984).

ing lesser violations than dishonesty, intentional stealing, or misappropriation.

After the *Bailey* and *Finlayson* cases, which, as we mentioned, *supra*, involved lesser offenses, we were concerned with an attorney's misappropriation of funds, and the mitigating factor of alcoholism in *Attorney Grievance Commission v. Dunphy*, 297 Md. 377, 467 A.2d 177 (1983). There, Dunphy, who had been convicted of fraudulent misappropriation by a fiduciary, relied on *Flynn, supra*, in arguing that the appropriate sanction for his misconduct should be an indefinite suspension, instead of a disbarment.

The facts of that case indicated that after a period of successful practice, Dunphy began to drink heavily and to neglect his practice. Several years later, Dunphy's son committed suicide and there was psychiatric evidence that the effect of his son's suicide was further adversely affecting the manner in which Dunphy practiced. Dunphy apparently blamed himself for his son's death, was compulsive in respect to visiting his son's grave, and suffered severe depression that then caused him to further abuse himself with alcohol. There was also testimony that he had organic brain damage. The hearing judge ultimately found that during the time of the misappropriations, or prior to the time of the misappropriations, Dunphy had become incompetent, at least partly because of his abuse of alcohol. The hearing judge further found that the brain damage he had suffered was a substantial cause of the commission of the acts of misconduct. Additionally, the hearing court noted:

"He has eschewed any use of the drug alcohol since November 5, 1981. He participated in intensive psychotherapy sessions with Dr. Ryan from May of 1981 until approximately one year ago. He is maintaining himself in daily sessions of Alcoholic Anonymous and he has become a sponsor for other members of Alcoholic Anonymous. He assists in alcohol rehabilitation programs in Lorton Penitentiary and lawyer counseling programs in Maryland."

*Dunphy,* 297 Md. at 384, 467 A.2d at 180. After reviewing the hearing court's findings, we stated:

> [W]e conclude, as in *Flynn,* that there did exist in this case serious physical and mental illness at the time of the commission of Dunphy's criminal acts which, while not excusing them, were to a substantial degree causally connected and sufficiently exculpatory as to warrant our not imposing the ultimate sanction of disbarment.... In so disposing of this case, there is, of course, no softening of our revulsion for misappropriation of funds entrusted to an attorney.

*Id.* at 385, 467 A.2d at 181 (footnote omitted) (citations omitted).[10] *Dunphy* then, is the third case, *Flynn* and *Cooper* being the previous two, in which we imposed a sanction of less than a disbarment, when the misconduct involved the stealing or misappropriation of funds of another and where alcoholism or drug addiction was considered a primary cause of the conduct. *Dunphy* was one of the first cases in which we began to recognize rehabilitation in alcohol abuse related cases.

*Dunphy* was followed the next day by another misappropriation of funds case, *Attorney Grievance Commission v. Willemain* 297 Md. 386, 387, 466 A.2d 1271, 1271 (1983). We announced at the onset that "As we did in *[Finlayson]*, among other cases, we shall attempt in this attorney disciplinary proceeding to use procedures directed at rehabilitation of the attorney." *Id.* Our hearing court in *Willemain* found:

> "... During this period of time, the Respondent was handling an extensive case load and it is apparent that he lost control of his law office management. As another mitigating factor, the Respondent was on tranquilizers and drinking heavily. He was having personal and emotional

---

**10.** As in most of our cases, in *Dunphy,* we considered the mitigating factors to be mitigation of conduct ("sufficiently exculpatory"). *The Random House Dictionary of the English Language* 498 (Unabridged Edition 1983) defines "exculpate" as "to clear from a charge of guilt or fault; free from blame; vindicate." By definition, sanctions cannot be "exculpated"—arguably, conduct can.

problems with his marriage, and he did seek marriage counseling in 1980. Further, he was having physical problems with his back during 1979, and at times was unable to physically sit up. He had the herniated disc removed in 1981.

"There is no evidence that the Respondent intentionally attempted to milk his clients but it appears that he lost control. He was unable to face the problem and help to solve it during the period of time in question."

*Id.* at 391–92, 466 A.2d at 1273.

The hearing court also found that Willemain had sought treatment from private psychiatrists, as well as from a psychiatric counselor for the Lawyer's Counseling Service of the Maryland Bar Association. He had been attending meetings of Alcoholic Anonymous. He was also being counseled by Mr. Richard B. Vincent, the Director of the Bar Association Service. We noted once again that we had been looking "at the shortcomings of attorneys in a somewhat different light" when the misconduct resulted in substantial part from physical and mental problems, "particularly where alcoholism was involved." *Id.* at 395, 466 A.2d at 1275. We indefinitely suspended Willemain, with the right to reapply immediately.

Citing *Willemain* and *Cooper* as authority, we again imposed a lesser sanction than disbarment in *Attorney Grievance Commission v. Aler*, 301 Md. 389, 483 A.2d 56 (1984). The facts relating to the impact of alcohol on Aler's conduct were similar to the facts in *Willemain.* We repeated our position that we viewed misconduct related to alcohol abuse "in a somewhat different light," but also repeated our concurrent position that "the mishandling of a client's funds will not be lightly regarded by this Court." *Id.* at 398, 483 A.2d at 61. We then noted:

Therefore, even given his apparent recovery from the ravages of alcohol, there must be some protection of the public from his mismanagement of his client's funds. . . .

In the past, we have held when there has been a misappropriation of funds that we will permit reinstatement of the

attorney only upon a showing of rehabilitation so complete that the misconduct will not be repeated. More recently, we have delineated certain conditions which, if met by the attorney being sanctioned, avoid the imposition of indefinite suspension. *Attorney Griev. Comm'n v. Truette,* 299 Md. 435, 474 A.2d 211 (1984); and *Attorney Griev. Comm'n v. Finlayson,* 293 Md. 156, 442 A.2d 565 (1982) (Alcohol abuse led to neglect of client's matters; reinstatement from indefinite suspension would be permitted upon a showing that certain conditions imposed by the Court were met).

*Id.* at 398, 483 A.2d at 61 (some citations omitted).

We then indefinitely suspended Aler, with the right to reapply after thirty days, subject to the respondent meeting certain conditions. One of these conditions was the requirement that he be monitored. Thus, in the *Aler* case, we began the practice of specifying a condition for the requirement of a monitor [11] that must be met before the attorney, whose sanctioned misconduct was caused by alcohol abuse, could be reinstated.

Interestingly, the beginning of the differing treatment of attorneys, depending upon their abuse of alcohol, is starkly contrasted by the different treatment afforded in *Truette* and in another case, *Attorney Grievance Commission v. Woodward,* 299 Md. 429, 474 A.2d 208 (1984), decided on the same day as *Truette.* At the time of the disciplinary proceedings, both Woodward and Truette were part time assistant State's Attorneys, one in Baltimore County and the other in Carroll County. Truette had apparently misappropriated funds belonging to clients. Woodward had failed to file income tax returns and to pay State income taxes. Truette, at least in part, blamed alcohol abuse for his misconduct. Woodward did not. Truette received a sanction of a future suspension unless

---

**11.** In the *Truette* case, Truette was already being voluntarily monitored prior to the Court's determinations. While we did not use the term monitor in the imposition of conditions, we did require him to be "supervised." Based in part upon *Truette,* we began, in *Aler,* the practice of requiring "monitoring" as a condition of reinstatement.

he complied with certain conditions the Court imposed. Woodward was summarily disbarred because we failed to find extenuating circumstances in his case. Accordingly, at least by this point in time, we were treating alcoholic attorneys more leniently than attorneys who did not proffer the excuse of alcohol abuse.

In *Attorney Grievance Commission v. Ezrin,* 312 Md. 603, 541 A.2d 966 (1988), the attorney had misappropriated large sums from his partnership, but, after the discovery of the theft, made full restitution. The hearing court specifically found that "neither drugs, alcohol, nor gambling was implicated in Ezrin's misconduct." *Id.* at 604, 541 A.2d at 966. Subsequent to his misconduct, Ezrin came under the care and treatment of psychiatrists who, in part, found that "his actions may be attributable to a mental disorder characterized as a mixed personality disorder." *Id.* While accepting that finding, the hearing court, based upon psychiatric evidence presented by Bar Counsel, also found, similar to Judge Cawood's finding in the case *sub judice,* that the misconduct was made " 'with full knowledge that he was committing illegal acts'; that he was not acting under 'any compulsion to steal'; that he possessed the 'full ability to cease such acts at any time'. . . ." *Id.* at 604–05, 541 A.2d at 967. The hearing judge also found that treatment for Ezrin's mental problems was "encouraging." *Id.* at 605, 541 A.2d at 967.

Ezrin argued before this Court that his misappropriations were caused by "his disabling emotional state, and did not involve client funds." *Id.* at 606, 541 A.2d at 967. Additionally, he argued several other standard responses—remorse, etc. Bar Counsel argued that the misconduct was not caused by Ezrin's mental condition and that no compelling extenuating circumstances existed. We framed the determinative issue: "Therefore, the basic question before us is whether Ezrin's mental condition was a substantial cause of the misappropriation—whether his dishonesty was the result of his mental illness." *Id.* at 608, 541 A.2d at 968. Concurring with the hearing judge's finding that the misconduct was not caused by

the mental problems, we declined to find extenuating circumstances and imposed the sanction of disbarment.

Just three years after our holding in *Ezrin, supra,* we apparently abandoned, at least temporarily, our position that disbarment was the proper sanction for dishonesty, misappropriation of clients' funds to one's own use and for fraud, stealing, serious criminal conduct, and like misconduct.

In 1991, we, with little cogent explanation, did not disbar but indefinitely suspended an attorney who had stolen money from his escrow account, where we accepted a hearing court's finding of no causal connection between the attorney's alcoholism and his misconduct. *Attorney Grievance Comm'n v. Bakas,* 323 Md. 395, 399, 593 A.2d 1087, 1089 (1991). We had initially remanded the matter to the hearing judge because he had "made no finding of fact as to the existence of any causal relationship between the misconduct and the alleged alcoholism." *Id.* at 398, 593 A.2d at 1089. On appeal following the first remand, after determining that the hearing judge had "improperly applied the clear and convincing evidence standard ... in determining whether Bakas had proved the causal relationship," we again remanded the case for the hearing judge to apply a preponderance of the evidence standard. *Id.* at 400, 593 A.2d at 1090. At the second remand hearing, the hearing judge found that Bakas had not established the causal relationship between his misconduct and his alcoholism, even by a preponderance standard. We then held that "[t]hus, we cannot say that [the hearing judge] was clearly erroneous in determining that the substantial or precipitating cause of Bakas's misconduct was not his alcoholism." *Id.* at 403, 593 A.2d at 1091.

In spite of the fact that the violations concerned offenses involving dishonesty—the intentional misappropriation to his own personal use of clients' funds in an escrow account, and in the face of our acceptance of the hearing court's finding that there was no causal connection between Bakas's alcoholism and his misconduct, and contrary to our stated reiteration of

the appropriate sanction for stealing, we did not disbar Bakas, stating:

> Misappropriation of funds by an attorney is an act infected with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction. *Ezrin, supra,* 312 Md. at 608–09, 541 A.2d 966.

*Id.* We then, for whatever reason, did not impose the sanction we had just said was appropriate.

> After consideration of all the circumstances, including the nature and gravity of the misappropriation, and the relatively short period during which Bakas's escrow account was in arrears, we think an indefinite suspension, rather than disbarment, is the appropriate sanction in this case.

*Id.* at 403, 593 A.2d at 1091–92.

Judge Bell (now Chief Judge Bell) concurring (as to the finding that there was no causal connection between the alcoholism and the misconduct), and dissenting (as to the sanction), joined by Judges McAuliffe and Rodowsky, stated in relevant part:

> [T]his Court nevertheless also holds that there are compelling extenuating circumstances sufficient to justify a lesser sanction than disbarment, specifically, the "nature and gravity of the misappropriation, and the relatively short period during which Bakas's escrow account was in arrears." By so doing, the majority makes the usual sanction applicable only in the case of "serious" misappropriations and rather lengthy escrow account arrearages. . . .

> The rationale advanced by the majority fails to support the sanction imposed. . . .

> . . .

> . . . [I]t is most inappropriate that the sanction be made to depend, as the majority does, on the "seriousness" of a misappropriation or the length of time the misconduct continued. As I see it, this is not what is meant by compelling extenuating circumstances.

*Id.* at 405–07, 593 A.2d at 1092–93. The decision in *Bakas,* sandwiched between cases holding to the contrary, in the context of trying to determine a consistency in our sanction practice in attorney disciplinary matters, is both perplexing, and, to a degree, disorienting. Most important, perhaps, it points to a need for there to be consistency in our imposition of sanctions, in order that the members of the bar will know what sanctions to expect for particular misconduct, and, as important, that the sanctions will be imposed equally for the same degree of misconduct. We will attempt, *infra,* in respect to the present and the future, to iterate what is, and what will be, a consistent and equally applied, sanction for misconduct involving dishonesty, misappropriation, fraud, stealing, serious criminal conduct, and like misconduct.

It was argued in *Attorney Grievance Commission v. Jacob,* 303 Md. 172, 492 A.2d 905 (1985), that Jacob's misconduct (false income tax returns) resulted from certain mental conditions. The hearing judge had found that his misconduct had not resulted from the fact that he had been "severely depressed and upset mental[ly] and [in an] emotional state during the period." *Id.* at 179, 492 A.2d at 908. We concurred with the hearing judge's finding, noting that the judge had found that Jacob was functioning adequately in other areas at the time of the misconduct. In *Attorney Grievance Commission v. Short,* 303 Md. 317, 493 A.2d 362 (1985), we held that the fact that Short had a serious heart attack just prior to the misappropriation of client's funds and was suffering other financial problems beyond his control, were not sufficient extenuating circumstances to warrant less than disbarment.

We had begun, by 1992, to look at misappropriation cases where attorneys were proffering alcoholism as an extenuating circumstance in attempting to avoid disbarment, more critically, by distinguishing how we considered evidence of alcoholism as a mitigating circumstance in *Attorney Grievance Commission v. White,* 328 Md. 412, 614 A.2d 955 (1992). In the process, we appeared to have set up a stricter standard for elevating alcoholism as a "compelling extenuating circum-

stance." Judge Bell (now Chief Judge Bell) pointed this out in his dissent:

The majority acknowledges that the respondent adduced testimony concerning his alcoholism, its duration and extent. The respondent testified about his historical involvement with alcohol and as to his perception of its effect on the charged misconduct, opining,—the hearing court and the majority characterize his opinion as "rationalization"—that his acts of misconduct were caused by the alcoholism. In addition, Richard Vincent, the Director of the Maryland State Bar Association's Lawyer Counseling Committee . . . testified to a "connection" between the respondent's thinking processes when misappropriating client funds and his alcoholism. He also testified that his drinking, *i.e.,* his alcoholism, "allowed [the respondent] to do it." . . .

. . .

. . . The majority does not expressly require the offer of expert medical evidence as a predicate to the court's consideration of whether, or finding that, the causation issue has been generated and proven. And it does not even purport to do so. But that may be the practical effect of this holding. The evidence in this case absent expert medical evidence, compares favorably with that in cases in which a causal relationship has been found. . . .

. . .

. . . I am satisfied, as is [the majority], that the alcoholism must be the root cause of the misconduct or have triggered it. I do not agree that the evidence in this case is insufficient, as a matter of law, to establish that connection.

*Id.* at 423–26, 614 A.2d at 961–62 (alteration in original).

Chief Judge Murphy, writing for the majority, had stated:

In determining whether the evidence before the hearing judge was legally sufficient to establish a causal relationship between the misconduct and the alcoholism, we have at times focused on whether the alcoholism was the "root

cause" of the professional misconduct, *i.e.*, whether it was responsible for the misconduct. . . .

We have thus made clear that where alcoholism is allegedly implicated in cases involving misappropriation of trust or client funds, a sanction less severe than disbarment may be imposed if the evidence discloses that the alcoholism, to a substantial extent, *was the responsible, the precipitating, the root cause of the misappropriation.* More, therefore, is required to establish the requisite causal relationship than a mere recitation of the attorney's life style and lengthy history of alcoholism. . . . A sanction less than disbarment, to be justified, must therefore demonstrate more than that the attorney is an alcoholic and that, as Vincent's testimony seemed to suggest, the theft was therefore a necessary product of that disease. . . .

. . .

Vincent testified that it was "consistent" with White's "alcoholic thinking" that he had a right to "borrow" the trust funds and that had White not been an alcoholic he would not have stolen the money. Vincent stated that there was a "connection" between White's thinking processes when he took the funds and his alcoholism. On cross-examination, Bar Counsel asked Vincent whether White, despite his alcoholism, knew what he was doing when he misappropriated the funds. Vincent said that was probable; nevertheless, he said that it was White's drinking that "allowed him to do it."

. . . Evidence that White's misconduct was, to a substantial extent, precipitated by his alcoholism is woefully absent in this case.

*Id.* at 418–21, 614 A.2d at 959–60 (emphasis added) (citations omitted). White was disbarred.

In the years that followed, we continued to look at alcoholism as an excuse or mitigating circumstance more critically in cases involving substance abuse. *See Attorney Griev. Comm'n v. Williams,* 335 Md. 458, 472–74, 644 A.2d 490, 497

(1994). There, Williams contended that his substance abuse problem caused his professional misconduct. A majority of the Court noted the hearing judge's finding:

"... It is clear that Respondent is addicted to cocaine and that it did affect his performance as an attorney. However, the causal relationship between Respondent's misconduct and his drug use is unclear and does not persuade this Court by a preponderance of the evidence that drug abuse was a substantial or precipitating cause of the professional misconduct. The Respondent suffers from an underlying mental state that can be termed "dysfunctional."... [T]his Court is not convinced that the misconduct was *solely* caused by the Respondent's use of the controlled substance."

*Id.* at 472–73, 644 A.2d at 497 (emphasis added). There was also conflicting psychiatric testimony in the case. One psychiatrist believed *that mental problems* caused by cocaine abuse were the cause of the misconduct, the other did not. We held that the hearing judge was free to accept or reject either or all of the psychiatric testimony. After noting that both psychiatrists found that the abuse affected Williams' ability to practice law, we noted: "This, however, is not the same as saying that cocaine abuse caused him to lie, steal or neglect his clients." *Id.* at 473, 644 A.2d at 497. We then held in respect to sanctions:

Although mindful that Respondent has been adjudged guilty of incompetence, neglect, misrepresentation, failure to communicate with his client and commingling of funds, we emphasize the sanction that will be imposed for the misappropriation of client funds, as this is the most egregious of his violations. We have said many times that misappropriation of funds by an attorney "is an act infected with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lessor sanction." While substance abuse can in certain cases justify a sanction less than disbarment, Respondent's addiction to cocaine in this case does not represent a compelling, extenuating circumstance justifying a more le-

nient sanction.  We have said that a sanction less severe than disbarment is not warranted absent evidence that the addiction, to a substantial extent, was the responsible, precipitating and root cause of the misappropriation....

*Id.* at 474, 644 A.2d at 497 (citations omitted).

Our skepticism over the use of alcoholism as a mitigating factor was further explained, when we notified the members of the bar of a future change in policy in a case in which we suspended the attorney rather than disbarring him, because of our adherence to the precedent of our cases.  *Attorney Griev. Comm'n v. Kenney,* 339 Md. 578, 664 A.2d 854 (1995).  There, the attorney had a history of alcoholism dating back twenty-five years, although for most of that time he was able to "function in a reasonably competent fashion."  *Id.* at 579–80, 664 A.2d at 854.  From 1989 on, he began consuming a quart of alcohol a day.

In one instance in 1992, he opened an estate for clients, and soon thereafter began to misappropriate funds from that estate to his own personal use.  In 1993, he misappropriated additional sums belonging to another client.  He also failed to remit withholding taxes to the Comptroller over a three-year period.  He was convicted of stealing the estate funds.

The hearing judge found as a fact that Kenney's alcoholism was, "to a substantial extent, 'the responsible, the precipitating, the root cause' of the Respondent's misappropriation of trust and client funds."  *Id.* at 586, 664 A.2d at 858.  Because the hearing judge made that specific finding, we felt at that time the need to follow our precedents and we imposed an indefinite suspension instead of disbarment.  We, nonetheless, expressed reservations, and chose to take the opportunity to caution the members of the bar about the Court's problems with a continuing recognition of a concept of alcoholism being used as an excuse for the serious offense of misappropriation of funds.  We said:

> While following precedent and ordering an indefinite suspension in the instant case, we caution members of the bar that *in the future,* we believe that, absent truly compelling

circumstances, alcoholism should not provide mitigation where an attorney has been found to have committed a violation which would ordinarily warrant disbarment. Because of our need to protect the public, the severity of such violations should not be denigrated because of an attorney's alcoholism.

We note that numerous other jurisdictions have found that alcoholism will not suffice to mitigate the sanction of disbarment. . . .

. . .

Courts have also refused to permit alcoholism to serve as mitigation where alcoholic attorneys have been found to have committed other serious offenses aside from misappropriation and commingling of client funds. . . .

. . .

We find the reasoning of these cases to be persuasive and caution that *in the future,* absent truly compelling circumstances, alcoholism will not be permitted to mitigate where an attorney commits a violation of ethical or legal rules which would ordinarily warrant disbarment. Severe sanctions are necessary to protect the public from being victimized from any further dishonesty on the part of the attorney. We do, however, recognize that alcoholism is a serious medical condition and we will be more sympathetic to attorneys who recognize their need for assistance and seek to rehabilitate themselves before their transgressions are discovered. Nonetheless, we believe that when violations ordinarily warranting disbarment are found, our duty to protect the public is strong and we cannot permit alcoholism to alleviate an attorney's responsibility to recognize the wrongfulness of his or her actions and to honor his or her commitments to his or her clients.

*Id.* at 591–95, 664 A.2d at 860–62 (citations omitted) (emphasis added) (footnote omitted); *see also Attorney Griev. Comm'n v. Sachse,* 345 Md. 578, 593, 693 A.2d 806, 814 (1997) ("Although

we have of late been reticent to allow alcoholism to mitigate violations of legal and ethical rules that would ordinarily warrant disbarment, . . . we recognize that Bar Counsel has not sought Sachse's disbarment. . . ."). We imposed an indefinite suspension in the reciprocal misappropriation case of *Attorney Grievance Commission v. Gittens*, 346 Md. 316, 697 A.2d 83 (1997), but did so, in part, in order to be consistent with the sanction imposed in the District of Columbia, the primary jurisdiction. We noted again, however, that: "We do not at all retreat from the views we expressed in *Kenney*. We simply do not need to apply them in this reciprocal discipline case." *Id.* at 327, 697 A.2d at 89 (citation omitted).

Very recently, in *Attorney Grievance Commission v. Tomaino*, 362 Md. 483, 765 A.2d 653 (2001), where alcoholism was not a factor, we referred again to the increasingly critical view we were directing towards cases involving dishonest conduct, including misappropriation. We said in *Tomaino*, 362 Md. at 498, 765 A.2d at 661, quoting from *Attorney Grievance Commission v. Sheridan*, 357 Md. 1, 27, 741 A.2d 1143, 1157 (1999), " '[m]isappropriation of funds by an attorney is an act infested with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction.' " We noted in *Tomaino*, that in the *Sheridan* case, we had imposed the lesser sanction of suspension because we felt "constrained to accept" the hearing judge's findings of mitigating circumstances.

We went on in *Tomaino* to again direct the attention of members of the bar to *Kenney*'s cautionary language. We disbarred Tomaino.

Accordingly, we reiterate once again the position we announced in *Kenney*. Moreover, we expound upon it by holding that, in cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from

any source that is the "root cause" of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

The circumstances of the present case are not so compelling. While under the system now in place, if the evidence supports such findings, we will normally accept a hearing court's findings that certain mental conditions exist and have certain effects, the question of whether such findings are "compelling extenuating circumstances," justifying a lesser sanction in cases of dishonesty, deceit, fraud, intentional misappropriation, stealing, and the like, are for this Court to answer. The existence of such factors is less compelling in such serious cases. Even alcoholics, and the mentally impaired but otherwise sane, generally know, as did respondent in this case, that it is wrong to steal or to commit other serious criminal offenses. Even if an attorney does not know that it is wrong to steal because of some form of mental condition and/or because of that condition is unable to conform his or her conduct to the requirements of law or of the MRPC, we still, in misappropriation cases and the like, must adhere to our primary function in disciplinary matters, *i.e.*, to protect the public. In such cases, the public ordinarily will be better protected by disbarment. We do not mean to say that alcoholism and mental impairments should not be considered by this Court or by the various disciplinary entities, in other lesser circumstances where attorneys are alleged to have violated the MRPC. The position we reiterate today is intended to apply to cases involving dishonesty, stealing, intentional misappropriation, fraud, serious criminal offenses, and the like; it is not intended to restrict consideration of alcoholism, mental impairments, and the like in other situations.

We are entirely cognizant of the situation that respondent found herself in just prior to the time she commenced to steal funds from the Association. We are not without sympathy for anyone, attorneys or laymen, who find themselves, often by reasons beyond their control, in strained financial circumstances, often with accompanying mental or physical disabilities. Most, however, in fact the vast majority, do not resort to the commission of crimes. Of those that do, and get caught, severe penalties are normally imposed. Attorneys should be held to higher standards, not favored with lower sanctions.

In the case *sub judice*, while there is evidence that respondent was a failure in selling real estate, and had personal problems, some of which were severe, there is little evidence that she was not able to handle the every day economic affairs of the life to which she had, in a manner of speaking, descended. In her job at the Association and in her life, she was able, except for the misappropriation of funds, to function satisfactorily, albeit in her then reduced and strained financial circumstances. Even with respect to her misappropriation of funds, she was able to keep a fairly complex scheme operating over a long period of time without being found out, and eventually was able to return the monies before the thefts were discovered. Her mental problems did not affect her ability to be a competent, and, for a period, successful thief. Her judgment when acting as a thief was appropriate—for a thief.

The mental condition of the attorney in *Flynn* had deteriorated to the extent that he could not adequately take care of the other aspects of his practice, or of his other business interests, as a result of his various problems, including his dependance on alcohol. The judicial panel in *Cooper* found that hospital records supported the position that his condition was related to alcohol abuse of such severity that it caused him to be hospitalized. Moreover, the panel found, from those records and from his demeanor at the hearing before it, that it confirmed "the disintegration of his mind and body which has followed this alcohol abuse." *Cooper*, 279 Md. at 612, 369 A.2d at 1062. The mental problems extant in *Cooper* and *Flynn* interfered with their ability to function to a much greater

degree than respondent's mental problems affected her ability to function in the present case.

We doubt, in any event, that had we adopted the standard we announced in *Kenney* at the time of *Flynn* and *Cooper*, or the other pre-*Kenney* cases, that we would have considered even their circumstances "compelling."

There *are* other cases, including a recent case where, for whatever reason, we did not impose the ultimate sanction of disbarment where the conduct clearly involved elements of intentional dishonesty. They include the pre-*Kenney* per curiam, unreported case of *Attorney Grievance Commission v. Lekin* [Miscellaneous Docket (Subtitle BV) No. 45, 1992 Term, filed Oct. 14, 1993], and *Attorney Grievance Commission v. Hess*, 352 Md. 438, 722 A.2d 905 (1999).

*Lekin, supra,* is a case where again we did not disbar a thief where, among other things, alcohol addiction was found by the hearing court to be a causative and mitigating factor. For whatever reason, Bar Counsel did not recommend disbarment, but an indefinite suspension. In *Lekin,* there was voluminous evidence of Lekin's prior good character from various luminaries of the Bar. We essentially wrote no opinion, but chose to quote almost completely the hearing judge's extensive written findings, and unsolicited recommendations as to sanctions. In other words, we merely noted that neither Lekin nor Bar Counsel had taken any exceptions to the hearing court's findings, and then imposed the sanction, indefinite suspension, recommended by Bar Counsel.[12]

Lekin had stolen money belonging to others. He took money from a trust of which he was a trustee and used it for his or his girlfriend's purposes. Like the present respondent, Lekin had replaced the money before it was discovered that it was missing. Unlike the respondent at bar, however, Lekin was not undergoing serious financial difficulties, and, in fact,

---

12. We readmitted Lekin in a four to three opinion. *Attorney Grievance Comm'n v. Lekin,* 339 Md. 200, 661 A.2d 717 (1995).

had access to other legitimate sources of funds. Nonetheless, he stole the money.

While *Lekin* was an unreported case, the disposition in that case, as well as the disposition in the *Hess* case, decided after *Kenney*, have been the subject of discussion among members of the bench and bar in respect to fairness and equality of treatment questions. Hess, was charged with violations of MRPC 8.4(c), where it was alleged, and ultimately found, that he had consistently over-billed and overcharged a client, in anticipation of having ultimately to reduce the client's bills under pressure from the client. In other words, because he believed the client would pressure him to reduce his bills, Hess inflated them in the amounts he thought he would later be pressured to reduce them. For the most part, he was subsequently pressured to reduce the bills in amounts roughly equivalent to the degree of inflation. We noted that "Hess does not deny that he caused the total hours on billings to Berman's enterprises to be inflated. . . ." *Hess,* 352 Md. at 443, 722 A.2d at 908. We noted that the hearing judge found: "In an attempt to cause the client to pay his bills, [Hess] resorted to what he himself has termed 'rough justice,' and in 1985 he began increasing the amounts on several pre-bills by 15%, then discounting those bills by 15%." *Id.* (alteration in original). The hearing judge found that billing fraud had occurred. We agreed.

The inquiry panel found that Hess had violated Rule 8.4(a) and (c). It recommended a private reprimand.[13] The Review Panel recommended the filing of formal charges.

We recognized that the hearing judge found several mitigating factors, none of which involved alcoholism or other addictions, or mental impairments. The mitigating factors were that Hess had been under stress from a large workload during the Maryland savings and loan crisis; that his firm was in a "tenuous financial situation"; that Hess was in the process of

---

**13.** We later noted that it was not the function "of an inquiry panel . . . to recommend a sanction." *Hess,* 352 Md. at 447, 722 A.2d at 910.

a bitter and embarrassing divorce; that he had shown remorse, and that there was no suggestion of a likelihood of previous or future similar conduct.

Without any extensive explanation of our reasoning, we did not disbar Hess but instead imposed a three-year suspension. We compared Hess's case with an unreported consent to disbarment matter, *Attorney Grievance Commission v. Digges* [Miscellaneous Docket (Subtitle BV), No. 38, 1989 Term], concluding, in attempting to distinguish *Digges,* that "[w]e take judicial notice that *Digges* involved the false increase in bills without, as here, an offsetting reduction, designed to give the illusion that a discount was being granted." *Id.*

■■■ Upon reflection as a Court, in disciplinary matters, we will not in the future attempt to distinguish between degrees of intentional dishonesty based upon convictions, testimonials or other factors. Unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character.

Disbarment ordinarily should be the sanction for intentional dishonest conduct. With our opinion today, we impress upon the members of the bar that the Court does not consider *Hess* or the pre-*Kenney* cases to be authority for an argument for leniency in attorney disciplinary matters involving intentionally dishonest conduct.

■■■ There is no evidence of alcohol abuse in the present case, but that alone would not be, necessarily, a requirement in cases in which mental impairment is asserted as a mitigating factor had we continued with the position we had taken pre-*Kenney*. However, when we are considering offenses relating to honesty, especially where there is any type of theft or intentional misappropriation of funds or other serious criminal conduct, there, since *Kenney,* needs to be almost conclusive, and essentially uncontroverted evidence that would support a hearing judge's finding not only that the attorney had a

serious and debilitating mental condition, but that the mental condition, in a sustained fashion, affected the ability of the attorney in normal day to day activities, such that the attorney was unable to accomplish the least of those activities in a normal fashion. Unless that standard is met the impairment is not "the root cause" of the misconduct.

The mere fact that an attorney steals or commits other serious criminal conduct, coupled only with evidence of mental impairment, whether arising out of alcoholism or out of other factors, that does not arise to the level we have mentioned above, generally will not be sufficient to establish that degree of mental incompetency that warrants a lesser sanction than the sanction that is otherwise appropriate for such misconduct involving stealing, intentional misappropriation of the funds of another, and the like, or other serious criminal conduct.

In this case, we find that disbarment is the appropriate sanction.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–515(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST SUSAN K. VANDERLINDE.**