**In re George EDELSTEIN,
Respondent.**

**A Member of the Bar of the District
of Columbia Court of Appeals.**

**No. 02–BG–71.**

District of Columbia Court of Appeals.

Argued Oct. 20, 2004.

Decided Feb. 23, 2006.

---

George Edelstein, pro se.

Catherine L. Kello, Assistant Bar Counsel, with whom Joyce E. Peters, Bar Counsel at the time the brief was filed, for the Office of Bar Counsel.

Before REID, Associate Judge, and WAGNER * and NEBEKER, Senior Judges.

---

* Judge Wagner was Chief Judge of the court at the time of argument. Her status changed to Senior Judge on December 21, 2005.

1. Mr. Edelstein's representation of the confidential informant ended in April 1993.

REID, Associate Judge:

In this reciprocal discipline case, the Board on Professional Responsibility ("the Board") has recommended that Respondent, George Edelstein, be disbarred based on discipline imposed by the United States District Court for the Southern District of New York. Mr. Edelstein takes exception to the Board's recommendation, claiming primarily that reciprocal discipline should not have been imposed under D.C. Bar R. XI, § 11(c)(1) and (2) because the New York ethics process violated his constitutional right to due process, and because there was an "infirmity of proof" with respect to the New York ethics panel's conclusion that his conduct was prejudicial to the administration of justice. He does not, however, challenge the Board's recommended sanction of disbarment. Our review of the record does not support Mr. Edelstein's contentions. Therefore, we accept the Board's recommendation for reciprocal discipline.

## FACTUAL SUMMARY

The record before us shows that Mr. Edelstein's disbarment in New York grew out of his representation during a period between 1991 and early 1993 of a criminal defendant who became a confidential government informant.[1] Mr. Edelstein made personal loans to this individual which amounted to $20,000.00. Respondent's disbarment also was related to his representation of another criminal defendant, Bartolome Moya, beginning sometime around July 1994. On July 20, 1994, Mr. Moya, disappeared and a warrant was issued for his arrest, due to his violation of his bail conditions. Mr. Edelstein told fed-

Around that time, he sued the informant and former client, demanding repayment of the loans he had made to him. In August 1993, Mr. Edelstein obtained a default judgment.

eral law enforcement officials that he did not know the whereabouts of Mr. Moya.

Mr. Edelstein met with the confidential informant in August 1994, and offered to disclose the whereabouts of Mr. Moya if the confidential informant would seek payment of $30,000.00 from the government in exchange for this information, and then in turn, would repay the $20,000.00 that Mr. Edelstein had lent to him. Subsequently, Mr. Edelstein increased the amount that the confidential informant should seek from the government to $100,000.00 so that he could provide a "top dollar" defense in his representation of Mr. Moya. Mr. Edelstein asked the confidential informant not to tell the government the source of the information disclosing Mr. Moya's whereabouts, and that if any question should be raised, Mr. Edelstein would say that he disclosed the whereabouts of Mr. Moya because Mr. Moya required medical attention. The conversation in which Mr. Edelstein demanded $100,000.00 was recorded by the confidential informant.

Later, Mr. Moya was captured, without assistance from Mr. Edelstein's information. On October 26, 1994, an Assistant United States Attorney sent a letter to the Chief Judge of the United States District Court for the Southern District of New York in which he informed the court of "what appears to be an actual conflict of interest presented by [Mr.] Edelstein's continued representation of defendant Bartolome Moya." On that same day, the Honorable Thomas P. Griesa of the United States District Court for the Southern District of New York held a hearing during which government counsel moved to disqualify Mr. Edelstein from Mr. Moya's case. When Judge Griesa asked Mr. Edelstein about the taped conversation of Mr. Edelstein's demand for $100,000.00 Mr. Edelstein said, in part, that the government had "sent a confidential informant ... to offer me money to disclose Mr. Moya's whereabouts." Mr. Edelstein stated that he "played along," and that the confidential informant had "displayed ... [a] .32 millimeter semi-automatic pistol." He maintained that he called the FBI, spoke with an agent, told the agent that Mr. Moya owed him $23,000.00 and had revealed a gun to him, and that he—Mr. Edelstein—did not know Mr. Moya's location. Mr. Edelstein asserted that he "was just playing the game ... [t]o find out how far the government would go in trying to compromise [him] and trying to fish information out of [him] about [his] client."

Judge Griesa did not make factual findings at the October 26, 1994 hearing, but stated that "whether [Mr. Edelstein made] a genuine effort to obtain money for [himself], or whether [he was] simply engaging in some kind of ruse to lead [the confidential informant] on, this was not an investigation to get evidence about witnesses who knew what Mr. Moya had or had not done." Rather, Mr. Edelstein's encounter with the confidential informant "relate[d] to George, Edelstein," and the judge found it "very difficult to see how this was something that should have been carried on by [Mr. Edelstein], even if what [he said was] correct." On November 10, 1994, Judge Griesa disqualified Mr. Edelstein from representing Mr. Moya. He noted that Mr. Edelstein was a "court-appointed attorney" and that whether "court-appointed or privately retained, the Court has the duty ... to excuse Mr. Edelstein from the case and to appoint new counsel" because "Mr. Edelstein has entered into discussions which raise questions about his own conduct, and therefore he now has a personal stake" in one "aspect" of Mr. Moya's case. Given his personal stake, Mr. Edelstein would not "be able to devote [his] energy and attention solely and exclusively for the benefit of the client."

The ethics matter was referred to New York disciplinary authorities. On September 18, 1995, Mr. Edelstein appeared for a deposition before the Departmental Disciplinary Committee, First Judicial Department, Supreme Court, Appellate Division. He explained that initially he was retained by Mr. Moya's family to represent him with respect to "[m]urder, kidnaping and drugs in a RICO setting," and subsequently was appointed by the court. Eventually the Chair of the Committee on Grievances for the Southern District of New York designated a panel of attorneys to hear the charges against Mr. Edelstein. The Statement of Charges was sent to Mr. Edelstein on July 15, 1996, and he was required "to show cause why discipline should not be imposed . . . ." Mr. Edelstein sought a delay in the proceedings because of his July 1996 open heart surgery. Further delays occurred when Mr. Edelstein presented a medical certificate to the Committee in December 1996, reporting his hospitalization for "Major Depression Disorder." Delays continued into 1997, 1998 and 1999. An amended statement of charges was filed in March 1999, and Mr. Edelstein was ordered to show cause why discipline should not be imposed based on the amended statement of charges.[2] In a letter of April 6, 1999, which sought summary judgment, or in the alternative, the dismissal in particular of charges 3 and 4, Mr. Edelstein challenged the following sentence that appeared in both of these charges: "Alternatively, if respondent did not know the whereabouts of [Mr.] Moya,

the conduct alleged [herein] violates DR 1–102(A)(5) of the Code of Professional Responsibility of the New York State Bar Association which prohibits a lawyer to '[e]ngage in conduct that is prejudicial to the administration of justice.'" He contended in his April 6, 1999 letter that the alternative charge "is so vague that it is impossible to address it in any meaningful way."

On April 16, 1999, a brief in support of the statement of charges was filed by the prosecuting attorney, and Mr. Edelstein was asked to serve reply papers as quickly as possible so that the ethics panel would receive the reply before his hearing took place on April 26, 1999. The chairperson of the panel left telephone messages inquiring whether the respondent intended to file a reply brief. Apparently in response to these messages, Mr. Edelstein sent a communication, including a legal argument, stating that he did not intend to file a reply. He did not appear at the April 26 hearing, and the panel advised him that the hearing would be reconvened on May 3, 1999. Mr. Edelstein did not appear on May 3. Instead he sent a communication by fax declining to attend the hearing, indicated reasons for not doing so, and included character letters.

Based upon documentary evidence, including the proceedings in Mr. Moya's case, Mr. Edelstein's answer to the statement of charges against him as well as his letters to the ethics panel, and exhibits submitted at the March 26 and May 3,

---

**2.** Charge one pertained to DR 5–103(B) of the Code of Professional Responsibility of the New York State Bar specifying that: "While representing a client . . . [a lawyer may not] advance or guarantee financial assistance to the client." Charge two alleged a violation of DR 5–101(A) prohibiting the acceptance of "employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's

own financial, business, property or personal interests." Charge five concerned DR 1–102(A)(4) which states that a lawyer may not "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." And, charge six alleged a violation of DR 1–102(A)(7) which provides that a lawyer may not "[e]ngage in any other conduct that adversely reflects on the lawyer's fitness to practice law."

1999 hearings, the ethics panel made findings establishing Mr. Edelstein's violation of most of the charges against him, including DR 1–102(A)(5) concerning "conduct that is prejudicial to the administration of justice." The panel recommended disbarment. He was disbarred from the United States District Court for the Southern District of New York on October 21, 1999; the United States Court of Appeals for the Second Circuit on January 10, 2000; and on February 5, 2002, the Appellate Division of the Supreme Court of New York, First Judicial Department barred him "from the practice of law in any form," and also prohibited him from "appear[ing] as an attorney and counselor-at-law before any court, judge, justice, board, commission or other public authority ...." in New York. After receiving notice of his disbarment in New York, by order dated February 28, 2002, this court temporarily suspended Mr. Edelstein from the practice of law in the District of Columbia pending final disposition of his disciplinary case by the Board. And, the United States Court of Appeals for the District of Columbia Circuit disbarred him on July 5, 2002.

## ANALYSIS

Mr. Edelstein argues that reciprocal discipline should not be imposed because the New York process deprived him of his right to due process, and because of the infirmity of proof against him regarding DR 1–102(A)(5). He maintains that his rights were violated because he was never properly informed of the charge that he engaged in "conduct that is prejudicial to the administration of justice," and he had no meaningful opportunity to be heard. Bar Counsel argues that the record shows that Mr. Edelstein had sufficient notice of this charge, that he willfully chose not to attend the hearing on the statement of charges against him, and that there was no infirmity of proof regarding his failure to

report the conduct of the informant promptly to law enforcement authorities.

■■■ "An attorney has a right to procedural due process in a disciplinary procedure." *In re Day,* 717 A.2d 883, 886 (D.C.1998) (citing *In re Ruffalo,* 390 U.S. 544, 550, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968)); *see also In re Richardson,* 692 A.2d 427, 433 (D.C.1997). "Due process is afforded when the disciplinary proceeding provides adequate notice and a meaningful opportunity to be heard." *Day, supra,* 717 A.2d at 886 (citation omitted). According to D.C. Bar R. XI, § 11(c)(1) and (2), "[r]eciprocal discipline shall be imposed unless the attorney demonstrates, by clear and convincing evidence, that: (1)[t]he procedure elsewhere was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process"; or (2) "[t]here was such infirmity of proof establishing the misconduct as to give rise to the clear conviction that the Court could not, consistently with its duty, accept as final the conclusion on that subject." Moreover, D.C. Bar R. XI, § 11(f)(2) establishes "a rebuttable presumption that the discipline will be the same in the District of Columbia as it was in the original disciplining jurisdiction." *See In re Goldsborough,* 654 A.2d 1285, 1287 (D.C.1995) (citation omitted); *In re Gardner,* 650 A.2d 693, 695 (D.C.1994).

Charges three and four of the amended complaint against Mr. Edelstein contained specific notice of the alternative charge concerning "conduct that is prejudicial to the administration of justice," with an express reference to DR 1–102(A)(5) of the Code of Professional Responsibility of the New York State Bar Association, and attached to the amended complaint was an affidavit from the prosecuting attorney explaining the reason for the alternative charges. The affidavit stated: "Charges

three and four are to be amended to add alternative claims which are intended to eliminate the need for the [ethics panel] to determine whether respondent knew [Mr.] Moya's whereabouts. Respondent claims he did not know." Mr. Edelstein's April 6, 1999 letter, sent after he received the amended complaint, actually discussed the DR 1–102(A)(5) charge, claiming that it was "so vague that it is impossible to address it in any meaningful way." He added: "The conduct alleged above [i.e., in the amended complaint] consists entirely of several things I said to the informant, to the assistants, and to the FBI. But the charge doesn't specify which particular things I said might have violated DR 1–102(A)(5). And DR 1–102(A)(5) itself provides no clue." In response to Mr. Edelstein's letter, which the ethics panel interpreted as a motion for summary judgment, the Prosecuting Attorney filed a memorandum in the United States District Court for the Southern District of New York which set forth the alleged factual basis for the amended charges three and four, including the alternative charge concerning DR 1–102(A)(5):

> DR 1–102(A)(5) covers "any kind of conduct that makes it more difficult for the justice system to work, or that undermines public confidence in the justice system." SIMMON'S CODE OF PROFESSIONAL RESPONSIBILITY ANNOTATED AT P. 20. There are appropriate ways to report suspected government conduct. Respondent chose none of them, and proffered his "sting" theory only when he got caught.

This paragraph clarified the nature of the alternative ground in charges three and four.

■ In *In re Bielec*, 755 A.2d 1018 (D.C.2000), we said that due process "includes fair notice of the charges" against a member of the bar. *Id.* at 1024. To determine whether the attorney in that case had fair notice, we focused on whether there was "any evidence in the record which describe[d] the specific charges against [the attorney] or the ethical violations that form[ed] the basis for [his discipline]." *Id.* Unlike *Bielec*, in this case the amended complaint as well as the prosecuting attorney's affidavit and reply to Mr. Edelstein's motion for summary judgment describe the specific charge against Mr. Edelstein and expressly cite and discuss DR 1–102(A)(5). And, he received notice of his March 26 disciplinary hearing and the continuation of that hearing on May 3. Yet, he chose not to be present to hear or contest the evidence against him concerning his alleged violation of DR 1–102(A)(5). In short, he received proper notice under our reciprocal discipline process, and had an opportunity to be heard. "Put simply, reciprocal discipline proceedings are not a forum to reargue the foreign discipline." *In re Zdravkovich*, 831 A.2d 964, 969 (D.C. 2003); *Richardson, supra*, 692 A.2d at 434. On this record, Mr. Edelstein was given adequate notice of the specific rule he allegedly violated in New York in prejudicing the administration of justice, as well as adequate notice of the conduct underlying that alleged violation, and the opportunity to present his case. Consequently reciprocal discipline cannot be denied on the basis of D.C. Bar R. XI, 11(c)(1).

■ Mr. Edelstein's "infirmity of proof" argument is equally unavailing. The June 2, 1999, Report of the Panel of Attorneys Appointed by the Grievance Committee, examined the proof against Mr. Edelstein and discussed the charges in some detail. Determining that Mr. Edelstein "had a duty to report the improper conduct to the [Assistant United States Attorney] or the court," the Panel concluded:

While, after the gun incident, Respondent reported Informant's alleged proposal to the FBI ... he does not claim that he revealed to anyone in the government the reward sharing aspect or his suspicion of government misconduct until he was confronted on October 25, 1994 with the informant's version supported by the tape ... as the result of the Informant's advising an FBI Agent of Respondent's alleged offer to sell Moya's whereabouts.

Respondent's claim that he thought that his private "sting operation" could ultimately help his client by showing government misconduct is specious. Respondent never articulated a theory as to how his client could benefit, and the Panel can think of none. In any event, by pursuing the private sting and failing to report the alleged misconduct to the Court or the Department of Justice, Respondent engaged in a course of conduct which was seriously prejudicial to the administration of justice .... As a former lawyer with the Department of Justice for some twenty years, he was aware of the potential prejudice to the administration of justice of a private person investigating rather than reporting possible official misconduct. And as the Informant's former attorney, he was aware that Respondent's negotiations with him might compromise ongoing investigations in which Informant was ac-

tive; indeed he has admitted that he has been so advised.

Several courts have examined the panel report and Mr. Edelstein's allegations of infirmity of proof and lack of notice. All have rejected his notice and infirmity of proof contentions. As we have indicated, these include the United District Court for the Southern District of New York, the United States Court of Appeals for the Second Circuit, the Appellate Division of the Supreme Court of New York for the First Judicial Department, and the United States Court of Appeals for the District of Columbia Circuit. On the record before us, we see no reason to disagree, or to deviate from one of our standard legal principles governing reciprocal discipline: "Under principles of collateral estoppel, in reciprocal discipline cases we generally accept the ruling of the original jurisdiction." *In re Shearin,* 764 A.2d 774, 777 (D.C. 2000); *see also In re Balsamo,* 780 A.2d 255, 259 (D.C.2001).[3]

Accordingly, for the foregoing reasons, we accept the recommendation of the Board that we impose reciprocal discipline and that Mr. Edelstein be disbarred. Therefore, it is

ORDERED that George Edelstein is hereby disbarred from the practice of law in the District of Columbia. It is

FURTHER ORDERED that Mr. Edelstein's reinstatement shall run from the

---

**3.** Mr. Edelstein also takes issue with the conclusion of the New York authorities that he engaged in a prohibited conflict of interest in failing to disclose his loan of $20,000.00 to a client whose representation he later renewed. He also maintains that his conduct did not violate Rule 1.8(d) of the District of Columbia Rules of Professional Conduct which generally provides that "a lawyer shall not advance or guarantee financial assistance to the client," except for certain stated and limited exceptions, which he agrees are not applicable to him. He insists that Rule 1.8(d) applies

only to civil litigation. The New York courts disagreed. And, the Arizona Supreme Court has rejected a similar contention. *See In re Bolding,* No. SB–02–0134–D, 2002 Ariz. Lexis 224 (Dec. 5, 2002). Under the circumstances of this particular case, we see no reason to deviate from the conclusion of the New York courts in this reciprocal proceeding. *See In re Velasquez,* 507 A.2d 145 (D.C.1986). We do not rule out the applicability of Rule 1.8(d) in other criminal contexts.

Mr. Edelstein does not contest the sanction of disbarment.

date he files the affidavit required by D.C. Bar XI, § 14(g), and it is

FURTHER ORDERED that the Clerk of the Court shall cause a copy of this order to be transmitted to the Chair of the Board on Professional Responsibility and to the respondent, thereby giving him notice of the provisions of Rule XI, §§ 14 and 16, which set forth certain rights and responsibilities of disbarred attorneys and the effect of failure to comply therewith.