**In re Robert Joel ZAKROFF, Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 163337).**

**No. 05–BG–740.**

District of Columbia Court of Appeals.

Argued Jan. 5, 2007.
Decided Oct. 25, 2007.

---

Robert Joel Zakroff, pro se.

John Thomas Rooney, Assistant Bar Counsel, with whom Wallace E. Shipp, Jr., Bar Counsel, and Traci M. Tait, Assistant

Bar Counsel, were on the brief, for the Office of Bar Counsel.

Before KRAMER, FISHER, and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

In this reciprocal disciplinary proceeding, the Board on Professional Responsibility (the "Board") has unanimously recommended that Robert Joel Zakroff, a member of the District of Columbia Bar, be disbarred. The Board's recommendation is based upon Zakroff's disbarment by the Court of Appeals of Maryland (sometimes referred to hereafter as "the Maryland court") for conduct, including intentional misappropriation of client funds and dishonesty, that violated a number of Maryland's Rules of Professional Conduct ("MRPC"). We agree with the Board that reciprocal discipline is appropriate. However, for the reasons explained below, which relate to the Maryland court's finding that during the relevant time period Mr. Zakroff was impaired by "significant depression," [1] we cannot conclude whether discipline identical to that imposed by Maryland is warranted. We remand the matter to the Board for a determination as to whether Respondent has been substantially rehabilitated and, if so, for a recommendation about what alternative sanction is appropriate.

## I. Background: The Maryland Proceedings

The Maryland court entered its order of disbarment on June 23, 2005, revoking Respondent's license to practice law in that jurisdiction.[2] In a 54–page opinion issued

1. *Attorney Grievance Comm'n of Maryland v. Zakroff*, 387 Md. 603, 876 A.2d 664, 678 (2005).

2. On the basis of the Maryland disciplinary action, reciprocal discipline proceedings were commenced in several other jurisdictions in

which Zakroff was admitted to practice. The United States Court of Federal Claims, the United States District Court for the District of Maryland, and the Commonwealth of Virginia have all revoked Mr. Zakroff's license to practice law.

on the same date, the court sustained findings of law by the Honorable Durke Thompson of the Circuit Court for Montgomery County, Maryland, reached after six days of evidentiary hearings and arguments, that Respondent violated the following Maryland Rules of Professional Conduct (2005): Rules 1.15(a) ("[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property"); 1.15(b) ("[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person"); 3.3(a) ("[a] lawyer shall not knowingly ... make a false statement of material fact or law to a tribunal"); 8.4(a) (it is professional misconduct for a lawyer to "(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another"); 8.4(b) ("[i]t is professional misconduct for a lawyer to ... (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects"); 8.4(c) ("[i]t is professional misconduct for a lawyer to ... (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation"); and 8.4(d) ("[i]t is professional misconduct for a lawyer to ... (d) engage in conduct that is prejudicial to the administration of justice"). Judge Thompson also found that Respondent violated provisions of the Maryland Business Occupations and Professional Code (Md.Code Ann., Bus. Occ. .& Prof. Art §§ 10–306 and 10–606, relating to a lawyer's use of trust money entrusted to the lawyer). With several corrections and exceptions, the Maryland Court of Appeals accepted Judge Thompson's findings of fact, which we summarize below.[3]

## A. Findings by the Circuit Court for Montgomery County

Respondent maintained an office for the practice of law in Bethesda, Maryland, practicing under the name Zakroff & Associates, P.C. He was the sole stockholder of the firm, which practiced primarily in the areas of personal injury, bankruptcy and collections. At the time of the hearing, the volume of the firm's cases was approximately 250 bankruptcy matters, 320–400 personal injury cases, and 1500–2000 collection matters. Respondent was the only person in the firm who could sign checks to make disbursements.

When a personal injury case was settled and the firm received settlement proceeds, clients were not promptly notified and "[n]o information was provided to the client as to the date of the actual receipt of the settlement proceeds by the law firm." 876 A.2d at 669. Some portions of the settlement proceeds were payable by the firm to clients' medical care providers, but Respondent often would not sign checks that had been prepared for his signature for periods of several months. On some occasions, respondent instructed his staff to respond to payment inquiries from medical care providers by telling them that cases had not settled, even when the cases had in fact settled and the law firm had received the settlement proceeds. Respondent also instructed his staff to provide clients of the law firm with misleading information when they called about settlement of their cases.

Respondent maintained several bank accounts in two different banks, including an escrow or trust account into which proceeds of client settlements were deposited and operating accounts for payment of firm expenses. When staff received calls from one of the banks indicating that an

---

**3.** Our summary reflects exceptions that the　　Maryland Court of Appeals sustained.

account balance was low, Respondent would direct staff to transfer funds between accounts. From time to time Respondent would also deposit personal funds into the client trust account to cover checks written from those accounts to clients and third parties. An auditor for the Maryland Attorney Grievance Commission found that for the audit period January 2, 2000 through July 31, 2002, the client trust account had a shortfall "ranging from a low of $174,000.00 to a high of approximately $421,000.00." *Id.* at 672. One specific finding by the auditor was that on May 11, 2000, the balance in the client trust account was less than $700. The next day, a settlement in the *Diaz* case resulted in a deposit into the trust account of $22,600. That amount was used to make disbursement to four other clients totaling $9,500, "causing insufficient funds to be available to satisfy the needs for the *Diaz* disbursement." *Id.* Respondent also withdrew from the trust account lump sums payable to Zakroff & Associates and "[o]nly rarely did the withdrawals represent sums properly earned as fees and costs advanced." *Id.*

For the January 2000 to July 2002 audit period, the auditor calculated the length of time between deposits of settlement proceeds and disbursement to third parties and clients and found that in twenty-four cases the time difference was more than six months, and in a few cases was as long as sixteen months, eighteen months, and nearly twenty-three months. *Id.* Judge Thompson found that "[w]hile some of the delay is accountable to a variety of possibilities, the pattern of delay together with the established balances in the trust account, demonstrate that the Respondent, who was the sole signatory for the accounts of the firm, knew there were insufficient balances to satisfy clients, medical and third party service providers because the Respondent had withdrawn money from the trust account and paid it into firm operating accounts in order to satisfy financial needs. The reason for the financial needs was, in part, due to the appropriation of monies from the business accounts to the Respondent personally." [4] *Id.* at 673.

During 1999–2000, Respondent, who "had experienced a dysfunctional family upbringing," encountered marital problems and sought therapy. *Id.* Licensed clinical social worker Paulette Hurwitz testified to her belief that Respondent's depression "interfered with [his] ability to think clearly and the depression interfered with the analysis of whether taking money from the trust account was more than a means to an end of solving some immediate problem." *Id.* at 673. Respondent "initially eschewed [taking] medication" for his depression because "his wife is a trained 'healer' using holistic treatment for ills." *Id.* at 674. Hurwitz opined that Respondent "did not think in terms of using the trust account monies as a wrongful act," *id.* at 673, but had no opinion as to whether Respondent "knew that taking monies was wrongful." *Id.*

Judge Thompson noted that Respondent "paints a picture of [his] practice as a chaotic affair with periodic crises" that was in this state because of "his own depression and his unwillingness to disappoint potential clients causing him to take on improvident cases"; that Respondent "asserts he never intended nor did he steal

---

4. Respondent excepted to Judge Thompson's finding that money appropriated from the law firm's business accounts was used to benefit respondent personally. The Maryland court found that "whether the Trust money was used to benefit respondent directly by being transferred into his personal account or indirectly by being used to maintain his law practice is a distinction without a difference." 876 A.2d at 684.

any monies from any client" and that "everyone who is due any monies have [sic] been paid in full"; and that Respondent "d[id] not deny the status of his trust account, but pleads ignorance to the precise balances and believed there were sufficient monies to cover the checks" he directed his staff to prepare. *Id.* at 674. However, Judge Thompson found "not credible" Respondent's assertion that he did not know of the deficiencies in the trust account and his professed ignorance of the multiple occasions of his depositing personal funds (including $80,000 in proceeds of a life insurance loan that Respondent took out) into the trust account. *Id.*

Judge Thompson also made findings about a bankruptcy matter handled by Respondent's law firm. The client, Patterson, had initially consulted Respondent about filing for bankruptcy. Associates in Respondent's firm presented for the client's signature and presented to the bankruptcy trustee bankruptcy schedules that did not list as an asset a claim that the client had against the Little estate, a claim being handled personally by Respondent. The claim also was not disclosed during a meeting of creditors when the bankruptcy trustee asked about the existence of any additional claims. *See* 876 A.2d at 675. After one of the associates who was the attorney of record for the bankruptcy matter learned of the claim, he advised the bankruptcy trustee of the claim. *Id.* at 676. The bankruptcy court sanctioned "counsel for the debtor" for the improper claim of an exemption. *Id.* at 685.

Judge Thompson also noted that several mental health professionals saw Respondent after the Attorney Grievance Commission commenced its investigation. Dr. Christianne Tellefsen, "a highly experienced psychiatrist," *id.* at 676, saw Respondent at the request of his counsel.

Dr. Tellefsen "was not familiar with any allegations of wrongful conduct," *id.*, but opined that Respondent had "depression with elements of mania and that the conditions were static for the entire adult life of Respondent," that he also evidenced "some attention deficit," that he "tended not to pay attention to problems until they became a crisis and then respondent provided a quick fix but did not address the root of the problem," and that he had "no deliberate intent to violate the rules, but only to cope." *Id.* at 676. Respondent "probably knew that taking the trust monies for his own use was wrong and that he felt badly about it. This dynamic only created more stress and more depression." *Id.* at 676–77.

Dr. Michael Spodak, a forensic psychiatrist, opined that Respondent had "mental difficulties [that] evidenced themselves in everyday life and not just in his practice" and "a debilitative mental condition that was the cause of the conduct in the allegations facing" him. *Id.* at 677. Respondent's symptoms included "disorganization, sleeplessness, irritability, stress, detachment, lack of emotion, procrastination, dishevelment, late payment of bills, expenditure of $40,000 for a pool to please his wife and then burying it, selling property at a loss, too much work, bad employees, late taxes, and the refusal to confront his daughter [who also suffered from depression] about remaining reclusive in the house." *Id.* Dr. Spodak "d[id] not believe that the Respondent intended to steal money" but his "depression caused the Respondent to not care about consequences and to not consider ethical responsibilities, although he did not let everything go to pieces." *Id.* Dr. Spodak agreed that Respondent "utilized quick fixes to meet his crises." *Id.* Dr. Spodak "felt that the Respondent had the ability to control his behavior, even though it was somewhat impaired." *Id.*

Dr. Jeffrey Janofsky, also a forensic psychiatrist, "agreed that the Respondent suffers from depression" but "believed it was much less than a major depression." *Id.* Dr. Janofsky cited to "Respondent's ability to restore the trust account by repayment, develop a methodology to cover shortages in the trust account, and [to] undert[ake] a determined assault on the medical insurers and medical providers for his clients." *Id.* Dr. Janofsky believed that Respondent is "much improved" as a result of taking Zoloft.[5] *Id.*

Taking into account the testimony of all of the mental health professionals, Judge Thompson found it "clear" that

Respondent suffered from significant depression and the depression affected both his personal and professional relationships and lifestyle. The depression interfered with Respondent's ability to think through the problems he perceived were plaguing him and to develop acceptable solutions and to implement them. As a result, Respondent was crisis driven which caused him to abuse his trust account and utilize monies deposited therein for others for his personal use.

*Id.* at 678. Judge Thompson found that Respondent acted "without malice toward clients or with intent to steal" and that "no client or medical assignee experienced any actual loss." *Id.* at 678. He also found, however, that "[t]he sheer magnitude of the imbalance of the trust account, the repeated conduct of drawing upon it, the methodology used by the Respondent, and his apparent appreciation of the wrongfulness, albeit rationalized away contradicts his claims of ignorance." *Id.*

Judge Thompson found "clear and convincing evidence" that Respondent "knowingly used client funds for unauthorized purposes," *id.*; that he misrepresented to the Attorney Grievance Commission investigator "the use of $50,000.00 deposited into the trust account purportedly to cover payroll when, in fact, it was used to pay proceeds to a client on a personal injury matter which could not be covered by existing balances," *id.* at 679; that he "delay[ed] in paying third party assignees [ ] monies due the assignees after a settlement was reached in a personal injury matter," *id.*; that the balance of Respondent's client trust account "was insufficient for much, if not all, of the period examined by the Petitioner's investigator," *id.* at 680; that "Respondent commingled funds by depositing his personal funds on nineteen separate occasions from April 2000 until July 30, 2002," *id.*; and that Respondent "directly or through those he directed, failed to promptly notify clients or other interested parties of the receipt of funds to which they were lawfully entitled" and "'kited' other settlements or supplied funds from his personal accounts to cover shortfalls," *id.*

**5.** We have described the testimony of the mental health experts regarding Respondent's depression because it is pertinent background for our consideration of whether Respondent has satisfied the test for so-called *Kersey* mitigation, discussed at pp. 424–26 *infra*. *See In re Kersey*, 520 A.2d 321 (D.C.1987); *see also In re Peek*, 565 A.2d 627, 631–33 (D.C.1989) (depression is a disability that may warrant *Kersey* mitigation). Drs. Tellefsen and Janofsky both opined that Respondent also suffers from a mood disorder, and Dr. Tellefsen found a personality disorder as well. *See* 876 A.2d at 676–77. We have not described their testimony on this subject in any detail because, although finding that "Respondent has been suffering from a mood disorder all his life," *id.* at 677–78, Judge Thompson made no finding as to what effect if any either of the disorders had on Respondent's conduct. We note that this court has not reached "the issue as to whether a personality disorder, standing alone, could serve as the basis for a mitigated sanction." *In re Drury*, 683 A.2d 465, 468 n. 5 (D.C.1996).

Regarding the Patterson matter, Judge Thompson found that "Respondent was also fully aware of the Patterson bankruptcy proceedings even though he did not personally handle the matter" but, after filing a lawsuit in an effort to recover monies for Patterson, "made no effort to notify the bankruptcy trustee" and "deliberately withheld information from the bankruptcy schedules." *Id.*

## B. The Maryland Court of Appeals Decision

The Court of Appeals of Maryland found that the "facts of this case support a finding of both intentional dishonesty and misappropriation on the part of the respondent." *Id.* at 690. Having accepted Judge Thompson's findings summarized above, the court stated that the "only remaining question" was the appropriate sanction.[6] *Id.* at 689. The court noted that the "standard for determining the appropriate sanction when an attorney's conduct involved intentional dishonesty and misappropriation," *id.*, was stated in the case of *Attorney Grievance Comm'n. v. Vanderlinde*, 364 Md. 376, 773 A.2d 463 (2001). The court quoted *Vanderlinde:*

> In cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct and that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC. Only if the circumstances are that compelling, will we even consider imposing

less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

773 A.2d at 485. The court then considered whether there existed "compelling extenuating circumstances" that warranted the imposition of a lesser sanction than disbarment and concluded that there were not. The court acknowledged that it was "undisputed that respondent suffers from 'significant' depression." 876 A.2d at 690. It noted that the mental health professionals disagreed about whether Respondent's disorders were the "root cause" of his behavior, *id.* at 691, but concluded that "[a]ssuming for the sake of argument that we accept the opinion that respondent's disorders were the root cause of his misbehavior, respondent would still fail to satisfy the *Vanderlinde* mitigation standard," since that standard "requires that the disability be nothing 'less than the most serious and utterly debilitating' mental condition and that the condition be not only the 'root cause' of the misconduct but also result in the attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC." *Id.* The court concluded that nothing in the record indicated that Respondent suffered from a disorder that rendered him utterly unable in that way. To the contrary, the court observed, during the relevant time period Respondent maintained a successful and high-volume law practice where he worked 70–80 hours a week. Noting that Respondent had presented to the court "a list of remedial actions that he alleges to have undertaken," the court stated that even "[a]ssuming ... that respondent tes-

---

6. The court noted that Maryland law permitted it "to confine its review [of Judge Thompson's findings] to the findings of fact challenged by the [parties'] exceptions," 876 A.2d at 682 (quoting Md. Rule 16–759(b)(2)(B)), which is the approach that the court took.

tified to these facts and that they are part of the record,[7] they would not change our disposition of this matter." *Id.* at 686 n. 17. The court concluded that the appropriate sanction was disbarment.

## C. Proceedings in This Jurisdiction

On July 19, 2005, the District of Columbia Bar Counsel moved this Court to disbar Respondent by reciprocal discipline under D.C. Bar Rule XI, § 11. We entered an order suspending Respondent from the practice of law in this jurisdiction and directed the Board either to recommend the appropriate discipline based upon reciprocity or to proceed with this matter *de novo.* Declining to proceed *de novo,* the Board filed its December 28, 2005 Report and Recommendation with this court, urging us to disbar Respondent on the basis of Maryland's full adjudication and subsequent order of disbarment. *See* Board Report at 14 ("We conclude that identical reciprocal discipline of disbarment is entirely appropriate").

Citing *In re Zdravkovich,* 831 A.2d 964, 968 (D.C.2003), the Board noted that there is a rebuttable presumption in favor of the imposition of identical reciprocal discipline unless the court finds that one or more of the exceptions set forth in D.C. Bar R. XI, § 11(c) applies.[8] *See* Board Report at 4–5. The Board rejected Respondent's argument that he was denied due process in the Maryland disciplinary proceedings, concluding that Respondent failed to show that he was denied "notice or a meaningful opportunity to explain or defend against the allegations of misconduct." *Id.* at 6. The Board also rejected Respondent's claims as to infirmity of proof, concluding that there was "more than sufficient evidence of misconduct," *id.* at 7, including misappropriation, dishonesty, and knowing omission of an asset from his client's schedule of assets filed in the bankruptcy court. The Board rejected Respondent's assertion that "the problems in the bankruptcy proceeding arose from his failure to properly supervise an associate."[9] *Id.* at 9.

7. The clerk of the Montgomery County Circuit Court transmitted the record to the Court of Appeals of Maryland pursuant to Maryland Rule 16–757(e) (2002), but inadvertently omitted the September 13, 2004 hearing transcript that, Respondent advised the Maryland court, contains *inter alia* his testimony as to his remedial actions.

8. Section 11(c) provides that reciprocal discipline will be imposed unless the attorney demonstrates, by clear and convincing evidence, that one of the following five conditions existed:

(1) The procedure elsewhere was so lacking in notice or opportunity to be heard as to constitute a deprivation of due process; or
(2) There was such infirmity of proof establishing the misconduct as to give rise to the clear conviction that the Court could not, consistently with its duty, accept as final the conclusion on that subject; or
(3) The imposition of the same discipline by the Court would result in grave injustice; or

(4) The misconduct established warrants substantially different discipline in the District of Columbia; or
(5) The misconduct elsewhere does not constitute misconduct in the District of Columbia.

Unless there is a finding by the Board under (1), (2), or (5) above that is accepted by this court, a final determination by another disciplining court that an attorney has been guilty of professional misconduct "shall conclusively establish the misconduct for the purpose of a reciprocal disciplinary proceeding" in this court. *Zdravkovich,* 831 A.2d at 967.

9. Regarding the bankruptcy matter, the Board's Report states that when Respondent's associate discovered that the claim against the Little estate that Respondent was pursuing on behalf of Patterson had been omitted from bankruptcy schedules, "Respondent assured the associate that it was not a problem." Board Report at 4. However, the Maryland court had sustained Respondent's exception to that finding by Judge Thompson, concluding that it was not supported by the

The Board determined further that the Maryland Rules that Respondent was found to have violated "are substantively similar to District of Columbia Rules," *id.*, and that "Respondent's misconduct in Maryland constitutes misconduct in the District of Columbia." *Id.* at 9, 10.

The Board then turned to Respondent's argument that, in the District of Columbia, the misconduct found by the Maryland court would warrant discipline substantially different from disbarment. The Board concluded that "[t]he sanction imposed in Maryland [disbarment] is precisely the sanction that would be imposed in the District of Columbia." *Id.* at 10 (citing *In re Addams,* 579 A.2d 190, 191 (D.C.1990)) (en banc) ("in virtually all cases of misappropriation, disbarment will be the only appropriate action unless it appears that the misconduct resulted from nothing more than simple negligence"). The Board rejected Respondent's argument that "his disability warrants mitigation of the sanction in this jurisdiction even though such mitigation was denied by the Maryland court." Board Report at 11. The Board quoted the Maryland standard for mitigation articulated in *Vanderlinde* and then described the mitigation standard in this jurisdiction:

> [I]n the District of Columbia mitigation is warranted when the respondent establishes that (1) he suffered from an impairment at the time he misappropriated funds; (2) a preponderance of the evidence supports a finding that his impairment "substantially caused him to engage in [the] misconduct;" and (3) he is now substantially rehabilitated.

Board Report at 12 (quoting from *In re Stanback,* 681 A.2d 1109, 1115 (D.C.1996)). The Board reasoned that "[a]lthough the standard for disability in mitigation in the District of Columbia is different than the standard in Maryland, both jurisdictions require a showing that the disability caused the misconduct." *Id.* at 11. The Board concluded that

> [t]he Maryland Court's findings demonstrate that the record evidence failed to establish the requisite causal nexus between the disability and the violations under *Kersey*—that Respondent's psychological impairments 'substantially caused him to engage in the misconduct.' Accordingly, Respondent is not entitled to *Kersey* mitigation for his intentional misappropriation and dishonesty.

*Id.* at 12–13.[10]

## II. Discussion

In his petition to this court, Respondent continues to urge that reciprocal discipline pursuant to D.C. Bar Rule XI, § 11(c), should not be imposed because he was denied due process in the Maryland disci-

---

record. 876 A.2d at 685. The Board also stated that "[t]he Maryland Court based its finding of a violation of MRPC 1.3 on Respondent's failure to file a bankruptcy petition for Mr. Patterson for more than six months after being retained to do so." Board Report at 9 n. 4. However, Judge Thompson found that the facts "do not rise to a level constituting a violation of Rule 1.3" and stated that "[n]or is there sufficient evidence that the Respondent was not diligent when he failed to amend the bankruptcy schedules." 876 A.2d at 680–81.

10. The Board also rejected Respondent's argument—which Respondent has not raised in the instant appeal—that the Maryland court's rejection of his mitigation defense was a failure to accommodate his disability, in violation of the Americans with Disabilities Act. *See* Board Report at 13 (citing *In re Marshall,* 762 A.2d 530, 539 (D.C.2000), and other cases for the proposition that a lawyer who engages in intentional dishonesty and misappropriation is not qualified to be a member of the Bar and thus cannot show that a disciplinary sanction excludes him from a benefit for which he is otherwise qualified).

plinary proceedings as a result of the Maryland court's failure to review the transcript of his September 13, 2004 hearing testimony before issuing its ruling; that there was an infirmity of proof as to intentional misappropriation of funds; and that any misconduct established warrants substantially different discipline in this jurisdiction because, in light of Respondent's depression and its effect on his conduct, the *Kersey* mitigation standard is met.

## A. Standard of Review

 As already noted, *see* note 8 *supra*, in reciprocal discipline proceedings, this court must "impose the identical discipline unless the attorney demonstrates, or the Court finds on the face of the record on which the discipline is predicated, by clear and convincing evidence, that one or more of the grounds set forth in [D.C. Bar Rule XI, § 11(c)] of this section exists." D.C. Bar R. XI, § 11(f)(2). The Respondent has the burden of establishing by clear and convincing evidence that a lesser sanction is warranted. *Zdravkovich*, 831 A.2d at 967. Clear and convincing evidence "is such evidence as would produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Estate of Walker*, 890 A.2d 216, 222 (D.C.2006) (citation and internal quotation marks omitted).

## B. Respondent's Due Process and Infirmity of Proof Claims

 We consider first Respondent's due process and infirmity of proof arguments,

and reject both. The record amply shows that Respondent was afforded notice and a full hearing before a trial judge in Maryland and obtained review of that trial judge's findings of fact and conclusions of law from the Court of Appeals of Maryland. *See In re Edelstein*, 892 A.2d 1153, 1157 (D.C.2006) ("due process is afforded when the disciplinary proceeding provides adequate notice and a meaningful opportunity to be heard") (quoting *In re Day*, 717 A.2d 883, 886 (D.C.1998)). As noted, Respondent complains specifically about the fact that the transcript of the September 13, 2004 hearing before Judge Thompson and exhibits to which Respondent referred during his testimony on that date [11] were not transmitted to the Maryland court before it issued its June 23, 2005 ruling.[12] However, although the Maryland court did not review the September 13 transcript before issuing its opinion, the court was apprised of its contents through Respondent's Exceptions to Judge Thompson's findings, and the court concluded that the testimony given would not have changed its disposition of the matter. *See Zakroff*, 876 A.2d at 686 n. 17. Also, as the Board found, "[t]he four challenges Respondent made to the trial court's findings based upon the missing [September 13, 2004] transcript related to findings of fact that the Maryland Court did not rely upon for its conclusions of law." Board Report at 6 (quoting *Zakroff*, 876 A.2d at 686).

Finally, Respondent filed with the Maryland court a Motion for Reconsideration in which he raised the missing transcript is-

---

11. Respondent asserts that the Montgomery County Clerk's office "lost the exhibits[,] which had been entered into evidence on prior days," and that "[t]hese exhibits have never been accounted for and it appears that the Md. Ct of Appeals never reviewed them."

12. We note that the Virginia State Bar Disciplinary Board, in its order disbarring Respondent, addressed this exact due process

argument. After conducting a hearing on Respondent's exceptions to the Virginia State Bar Counsel's request for reciprocal discipline, the Virginia Board found that Respondent did not establish by clear and convincing evidence that the Maryland proceeding was so lacking in notice or opportunity to be heard as to constitute a denial of due process.

sue and to which—he confirmed at oral argument before us—he appended the theretofore missing transcript.[13] Thus, the Maryland court had an opportunity to review the transcript before it denied Respondent's motion (on August 9, 2005). We owe "due deference" to the Maryland court's ruling in which, notwithstanding the court's opportunity to review Respondent's September 13, 2004 testimony, the court rejected Respondent's due process challenge. *In re Robertson,* 618 A.2d 720, 723 (D.C.1993). In light of all these factors, we conclude that Respondent has not established by clear and convincing evidence that he was denied due process in the Maryland disciplinary proceedings.

In essence, Respondent's infirmity of proof argument is that the Maryland court's factual findings do not establish by clear and convincing evidence that Respondent engaged in any intentional wrongdoing. However, "the infirmity of proof exception is not an invitation to the attorney to relitigate in the District of Columbia the adverse findings of another court in a procedurally fair hearing." *In re Gansler,* 889 A.2d 285, 288 (D.C.2005) (quoting *In re Bridges,* 805 A.2d 233, 235 (D.C.2002)). We conclude here, as we did in *Gansler,* that Respondent's assertion "falls well short of meeting [the] 'heavy' burden" that

must be met by a Respondent seeking to avoid the factual findings of another disciplining court. 889 A.2d at 288. The Maryland court's findings rested in part on Judge Thompson's credibility determinations, and "we are not in as good a position as the trier of fact was to judge who is and who was not telling the whole truth." *In re Shillaire,* 549 A.2d 336, 343 (D.C.1988) (quoting *In re Gamblin,* 458 S.W.2d 321, 323 (Mo.1970)). We conclude—borrowing the terminology used in *Gansler*—that the Maryland court "devoted substantial attention to the issue" of whether Respondent intentionally misappropriated client funds and misled the bankruptcy trustee, and we discern no infirmity in its ruling. *Gansler,* 889 A.2d at 288.

## C. Substantially Different Discipline

We now consider whether respondent has overcome the "rebuttable presumption that the discipline will be the same in the District of Columbia as it was in the original disciplining jurisdiction," *In re Zilberberg,* 612 A.2d 832, 834 (D.C. 1992), on the ground that his misconduct warrants "substantially different discipline" in this jurisdiction. D.C. Bar Rule XI, § 11(c)(4). We must consider "(1) whether the misconduct would have resulted in the same punishment in the District;

---

13. The September 13, 2004 transcript contains the entirety of Respondent's testimony before Judge Thompson. That testimony and the missing exhibits, *see* note 11 *supra,* relate in part to Respondent's explanation of what transpired with respect to the Patterson bankruptcy. Among other things, Respondent testified that when the bankruptcy schedules were prepared, the claim against the Little estate had not yet arisen, *i.e.,* the claim was a post-petition claim. Respondent also testified that the meeting with creditors was transcribed and that the transcript, which was an exhibit submitted to Judge Thompson, shows that the bankruptcy trustee cut off Patterson when he attempted to inform the trustee of his claim against the Little estate. Respon-

dent also referred to exhibits that were facsimile cover sheets showing that he advised the bankruptcy trustee of the Little claim. Although Respondent argues that his testimony on the matter was not fully considered by the Maryland court, we note that Respondent acknowledged during his testimony that until May 2001 (several months after the bankruptcy filing), "there was nothing filed with the bankruptcy court indicating that there were negotiations going on with regard to the Patterson claim." This admission was one basis for the Maryland court's finding that Respondent intentionally omitted the Little claim from the bankruptcy schedules. *See Zakroff,* 876 A.2d at 688.

and (2) if the sanction would have been different, whether it is substantially so." *In re Meaden*, 902 A.2d 802, 815 (D.C. 2006) (citation omitted).

■■■ There is no question that in this jurisdiction, a finding that a lawyer knowingly misappropriated client funds supports the sanction of disbarment. We have said that "[i]n this jurisdiction misappropriation of funds warrants disbarment in virtually all cases." *In re Larsen*, 589 A.2d 400 (D.C.1991);[14] *see also In re Reid*, 540 A.2d 754, 759 (D.C.1988) (citing the "well established rule in this jurisdiction that, with limited exceptions, the sanction for misappropriation of client funds is disbarment"). While Respondent emphasizes that there has been no finding that he had the intent to steal, that is beside the point, because a showing of an intent to steal is not required to disbar an attorney for misusing client funds. *See In re Harrison*, 461 A.2d 1034, 1036 (D.C.1983) (defining misappropriation as "any unauthorized use of client's funds entrusted to [a lawyer], including not only stealing but also unauthorized temporary use for the lawyer's own purpose, whether or not [he] derives any personal gain or benefit therefrom"); *see also In re Carlson*, 802 A.2d 341, 348 (D.C.2002) (misappropriation occurs whenever the balance in an attorney's escrow account falls below the amount due to the client); *In re Edwards*, 808 A.2d 476, 484

(D.C.2002) ("misappropriation revealing an unacceptable disregard for the safety and welfare of entrusted funds will warrant disbarment") (quoting *In re Anderson*, 778 A.2d 330, 338 (D.C.2001)).

The foregoing does not end our analysis, however. We must determine (if we can on the Maryland record) whether Respondent's misconduct actually would have resulted in substantially different discipline had he engaged in misappropriation of client funds within the District of Columbia. Respondent argues that the findings of dishonesty and misappropriation of client funds would warrant substantially different discipline here because the depression from which he suffered during the relevant time period "substantially affected his misconduct." *Stanback*, 681 A.2d at 1114–15. This means, Respondent argues, that even in the absence of "utter inability" to conform his conduct to the rules of professional conduct, the mitigation standard established in *Kersey* is met. Bar Counsel, on the other hand, urged at oral argument that our decision last year in *Meaden* requires us to accept the Maryland court's ruling that a mitigation of sanction is not warranted.

In *Meaden*, the respondent had been suspended from the practice of law by the Supreme Court of New Jersey for, *inter alia*, lying on seven applications to purchase handguns (by failing to disclose his

---

**14.** As we explained in our *en banc* opinion in *Addams*:

> While we recognize that the sanction for intentional misappropriation of client funds will be harsh in comparison to sanctions for other disciplinary violations involving conduct some may view as roughly equivalent misconduct, *see, e.g., Reback* [513 A.2d 226 (D.C.1986)] (imposing six months suspension for filing falsely signed court documents and lying to client); *In re Hutchinson*, 534 A.2d 919 (D.C.1987) (en banc) (one-year suspension for lying to a federal law enforcement agency), our concern is

that there not be an erosion of public confidence in the integrity of the bar. Simply put, where client funds are involved, a more stringent rule is appropriate.

579 A.2d at 198. Addams had been "entrusted by [his client] with the funds required to stave off the foreclosure of her home. He jeopardized her ability to do so when he took funds from the escrow account and tendered a check to the noteholder which was returned for insufficient funds. He took funds from the escrow account on more than one occasion.... He knowingly used his client's money as if it were his own...." *Id.* at 199.

psychiatric history) and for using another individual's credit card information without authorization to purchase golf clubs and bags. *See* 902 A.2d at 805, 806. Police also found in Meaden's possession mail and credit card statements of two other individuals. *Id.* at 805 n. 5. In mitigation, Meaden presented to New Jersey disciplinary authorities evidence that he suffered from bipolar disorder. *Id.* at 806–07. The New Jersey Supreme Court upheld a finding by the state's disciplinary review board that Meaden's evidence regarding purported mitigation fell short of the standard established by *In re Jacob*, 95 N.J. 132, 469 A.2d 498, 501 (1984) (finding that mitigation was "unavailing" where the disciplinary review board "correctly determined that respondent's medical presentation failed to establish any 'causal connection' between [Jacobs'] condition and his financial depredations," the hearing panel and ethics committee were not persuaded that Jacobs' medical condition was "an exclusive or major cause of his ethical derelictions," and there was "no demonstration by competent medical proofs that [Jacobs] suffered a loss of competency, comprehension or will of a magnitude that could excuse egregious misconduct that was clearly knowing, volitional and purposeful"). The New Jersey court suspended Meaden for three years with a fitness requirement.

■ In reciprocal proceedings in our jurisdiction, Meaden argued that "he would have prevailed on his claim of mitigation of sanction under the standard set forth in *Kersey*," 902 A.2d at 813, and that, assuming reciprocal discipline was warranted, this jurisdiction should impose nothing more than probation with conditions. *Id.* at 808. In rejecting Meaden's argument

that reciprocal discipline was not warranted, we relied on *In re Benjamin*, 698 A.2d 434 (D.C.1997), quoting it for the proposition that "[u]nder principles of collateral estoppel, in reciprocal discipline cases we generally accept the ruling of the original jurisdiction, even though the underlying sanction may have been based on a different rule of procedure or standard of proof." 902 A.2d at 814 (quoting *Benjamin*, 698 A.2d at 440 (rejecting respondent's argument that reciprocal discipline should not be imposed based on a New York disciplinary action because New York uses a lower standard of proof in attorney discipline cases than the District of Columbia uses, reasoning that "the difference in evidentiary standards between New York and the District of Columbia in disciplinary cases does not, on its face, establish an infirmity of proof," *id.* at 439)).[15] We concluded that Meaden had "provided no persuasive reasons why we should depart from general principles of collateral estoppel and reject reciprocal discipline in this case," 902 A.2d at 814, and that Meaden "cannot avoid reciprocal discipline by attacking collaterally the New Jersey tribunal's ... application of that jurisdiction's law to the facts of the case." *Id.* at 815. We reasoned that "[a]lthough the *Jacob* standard differs somewhat from the *Kersey* standard, that distinction alone is not sufficient in itself to avoid a reciprocal discipline proceeding." *Id.* at 814.

Thus, under *Meaden*, Maryland's different standard for mitigation provides no basis for us to decline to impose (some form of) reciprocal discipline on the basis of the Maryland court's findings. And, if the standard for mitigation in Maryland were merely "somewhat different" from our *Kersey* standard, *Meaden* would also

---

**15.** As we noted in *Benjamin*, "New York applies a 'fair preponderance of the evidence' standard," while the District of Columbia "requires proof of attorney misconduct by 'clear and convincing evidence.'" 698 A.2d at 437 n. 6.

require us to impose a sanction identical to the discipline that the Maryland court imposed, so long as that discipline falls within the range of sanctions that we would impose, in an original proceeding, for the violations in issue. *See id.* at 815 ("the question is whether the upper range of any sanction here would be '*substantially* different' from the sanction imposed in New Jersey") (emphasis added in the original) (quoting *In re Garner*, 576 A.2d 1356, 1357 (D.C.1990)). But we do not read *Meaden* or any of our other precedents as requiring us to impose such an identical sanction if—as we conclude *infra*—Maryland's mitigation standard is more than "somewhat different" from our own standard.

Maryland's *Vanderlinde* standard requires proof of a lawyer's "utter inability to conform his or her conduct" to the rules of professional conduct. 773 A.2d at 485. *Vanderlinde* also requires a showing of nothing less than "the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the 'root cause' of the misconduct." *Id.* By contrast, *Kersey* mitigation requires Respondent to show "(1) by clear and convincing evidence that [he] had a disability; (2) by a preponderance of the evidence *that the disability substantially affected* [his] *misconduct;* and (3) by clear and convincing evidence that [he] has been substantially rehabilitated." *In re Verra*, 932 A.2d 503, 504, 2007 D.C.App. Lexis 484, *5 (D.C.2007) (emphasis added), quoting *In re Lopes*, 770 A.2d 561, 567 (D.C. 2001). We explained in *Kersey* that the "substantially affected" test is met if an attorney shows that "but for [his disabling condition], his misconduct would not have occurred." 520 A.2d at 327. We found that a mitigated sanction was warranted even while acknowledging that "it is an impossible burden to prove that Kersey's alcoholism caused each and every disciplinary violation," *id.* at 326, meaning that we did not require a showing that each offending act was caused by his impairment; it was enough that "Kersey's professional conduct was substantially affected by his alcoholism" and that his "alcohol abuse affected his thoughts and judgment." *Id.* In *In re Temple*, 596 A.2d 585 (D.C.1991), we explained further that the "but for" test does not require proof that the attorney's disability was the "sole cause" of the attorney's misconduct. *Id.* at 586. We instructed that in applying the *Kersey* test, the issue is whether "'a sufficient nexus between [the respondent's disability] and his misconduct' had been established," *id.* at 589 (quoting *Kersey*, 520 A.2d at 327), and whether "removal of the substantial contributing factor ... would eliminate the offensive conduct," even if there are other reasons for some of the misconduct. *Id.* (citing *Kersey*, 520 A.2d at 327 n. 16); *see also Temple*, 596 A.2d at 590 (explaining that "there must be a close nexus between the misconduct and the mitigating factor proffered, whether alcoholism, drug addiction or mental illness," and holding that this test was met even though Temple "was able to manage an appearance of normalcy in his law practice").[16]

---

16. In *In re Lopes*, 770 A.2d 561 (D.C.2001), we reiterated the "substantially affected" test, *id.* at 567, but also said that Bar Counsel had "correctly state[d]" that "it was incumbent upon [Lopes] to show that his illnesses, however labeled, *deprived him of the meaningful ability to comport himself in his professional conduct in accordance with the basic norms of professional responsibility.*" *Id.* (emphasis added). We concluded that *Kersey* mitigation was not warranted, deferring to the Board's finding, after original-discipline proceedings, that there was too "tenuous a link" between Lopes' psychological and physical impairments and his forgery of clients' signatures on documents. *Id.* at 567–69. We agreed that there was insufficient proof that Lopes was rendered "unable to understand that he was

We conclude that Maryland's *Vanderlinde* standard is substantially different (not merely "somewhat different") from our *Kersey* standard.[17] The Maryland standard sets a substantially higher bar and will require an unmitigated sanction in some cases in which, in our jurisdiction, a mitigated sanction would be warranted. To read *Meaden* as requiring us to impose identical reciprocal discipline in this case even in light of this difference would enervate Rule XI, §§ 11(c)(4), which establishes an exception to reciprocal discipline where the "misconduct established warrants substantially different discipline in the District of Columbia," and 11(f)(2), which provides that "the Court shall impose the identical discipline unless the attorney demonstrates . . . that one or more of the grounds set forth in subsection [c][18] of this section exists." We hold instead that if the factual findings of record establish that Respondent met the *Kersey* mitigation standard (albeit not the *Vanderlinde* standard), the presumption in favor of identical reciprocal discipline must fall away.

■ Accordingly, before determining what sanction is appropriate, we must consider whether the Maryland court's factual findings establish that the *Kersey* standard was met. As noted, the Maryland court found that Respondent suffers from "significant depression." 876 A.2d at 678. Because we have previously recognized that depression is a disability that may

warrant *Kersey* mitigation, *see, e.g., Peek,* 565 A.2d at 631–32, the first prong of the *Kersey* test is met ("an attorney must demonstrate (1) by clear and convincing evidence that he had a disability," *Lopes,* 770 A.2d at 567). The Maryland court also found that Respondent's depression did not render him utterly unable to conform his conduct in accordance with his ethical obligations, *see* 876 A.2d at 691, and that he abused his trust account in a "determined and knowing" manner. *id.* at 678. From this the Board concluded that "[t]he Maryland Court's findings demonstrate that the record evidence failed to establish the requisite causal nexus between the disability and the violations under *Kersey*— that Respondent's psychological impairments 'substantially caused him to engage in the misconduct.'" We cannot agree.

Except for a handful of findings that are not pertinent to our discussion, the Maryland court adopted Judge Thompson's findings. Judge Thompson found by clear and convincing evidence that Respondent's "depression affected both his personal and professional relationships and lifestyle"; that his "depression interfered with Respondent's ability to think through the problems he perceived were plaguing him and to develop acceptable solutions and to implement them"; and that "[a]s a result, Respondent was crisis driven which caused him to abuse his trust account and utilize monies deposited therein for others for his personal use." 876 A.2d at 678. We think these conclusions amount to findings-factu-

---

being dishonest or *unable to behave otherwise." Id.* at 569 (emphasis added). While the language from *Lopes* that we have italicized is linguistically similar to the Maryland *Vanderlinde* standard, nothing in *Lopes* suggests an intent by the panel to construe *Kersey* as requiring the same showing of "utter inability" that *Vanderlinde* requires.

**17.** *Cf. In re Pennington,* 921 A.2d 135, 140–41 (D.C.2007) (noting the "important difference" between Maryland's standard regarding "how

mitigating or extenuating circumstances will be considered" in cases of intentional dishonesty of any type, and this jurisdiction's standard).

**18.** As codified, section 11(f)(2) refers to "subsection (b)" rather than "subsection (c)," but "we have recognized that this section of the revised rule is intended to refer to subsection (c)." *In re Drury,* 638 A.2d 60, 62 n. 7 (D.C. 1994).

al findings by which we are bound [19]—that Respondent's depression "substantially affected his misconduct," *Lopes*, 770 A.2d at 567, and "substantially caused" him to misappropriate the funds in his client trust accounts, *Stanback*, 681 A.2d at 1115; and that "but for" Respondent's depression, the conduct in issue would not have occurred. *Kersey*, 520 A.2d at 327. We must conclude, therefore, that with respect to his misappropriation of client funds, Respondent has satisfied the second prong of the *Kersey* test, and we must reject the Board's conclusion to the contrary. *Cf. In re Appler*, 669 A.2d 731, 739 (D.C.1995) ("we conclude that there was *no* significant evidence of record that could have led the Board majority to find that respondent had not met his burden to prove that the bipolar condition substantially affected his conduct.... Therefore, we conclude that the Board's finding on this question is 'unsupported by substantial evidence of record' ").[20]

What we cannot conclude on the record before us is whether Respondent satisfied the third prong of the *Kersey* test, *i.e.*, that he "prove by clear and convincing evidence that he now is substantially rehabilitated." *Stanback*, 681 A.2d at 1115. Judge Thompson made no findings regarding rehabilitation,[21] and the Maryland court, having found that Respondent was not utterly unable to control his conduct, deemed any facts pertinent to rehabilitation unavailing. *See* 876 A.2d at 686 n. 17. Yet, as the Maryland court's opinion notes, Respondent offered testimony that he is now taking medication for depression, has taken courses in accounting and

---

**19.** *See In re Hermina*, 907 A.2d 790, 796 (D.C. 2006) ("We are bound by this finding"); *see also In re Sheridan*, 798 A.2d 516, 518 (D.C. 2002) ("We defer to findings of fact made by other courts in reciprocal proceedings.").

We deem it unimportant that the Maryland court did not articulate precisely what in our jurisdiction is "the critical factual finding," *Peek*, 565 A.2d at 632, *i.e.*, that Respondent's depression "substantially affected his professional conduct." *Id.* In an analogous situation in *Peek*, where the Hearing Committee did not make the critical factual finding, we accepted the Board's determination that there were factors in the record that "serve[d] as a legal surrogate of a specific finding under the *Kersey* 'but for' test of causation," *id.* at 631, including that during the period in question Peek had chronic uncontrolled depression and that his doctor concluded that his misconduct "stemmed directly from his acute depressed state." *Id.* at 631 n. 5.

**20.** The Board stated in its Report that "the Maryland Court considered evidence regarding Respondent's depression and concluded that it did not support a finding that Respondent's depression was the 'root cause' of his misconduct that left him 'utter[ly]' unable to confirm to the MRPC." Board Report at 11. This statement is misleading because it may

be read to imply that the Maryland court made a finding that Respondent's depression was not the root cause of his misconduct. The court did not make such a finding, however. Rather, the court acknowledged that mental health experts disagreed on the point. *See* 876 A.2d at 690–91. The court noted that Dr. Janofsky opined that personality disorders, one of Respondent's afflictions, " 'generally [are] not the root cause of any behaviors.' " *Id.* at 691. However, the court also noted that "[t]here was also testimony by a number of medical health professionals that [Respondent's] disorders [depression as well as mood and personality disorders] were the root cause of his misbehavior." *Id.* at 690–91; *see also* 876 A.2d at 677 (summarizing Dr. Spodak's testimony that Respondent had a "debilitative mental condition that was the cause of the conduct in the allegations ...."). The court went on to assume without deciding that Respondent's disorders were the root cause of his misbehavior, reasoning that Respondent still failed to meet the *Vanderlinde* standard because his disability did not meet the "utterly unable to conform" standard. *See id.* at 691.

**21.** Judge Thompson made no findings as to rehabilitation, but it is misleading to assert, as Bar Counsel does, that "the trial court found *no* evidence that Respondent is rehabilitated."

office management, attended a Maryland Bar Association workshop for solo practitioners and small firms, hired an accountant to review his financial transactions on a weekly basis, was counseled by the Maryland State Bar Association Lawyer Assistance Program, was seeing his clinical social worker on a weekly basis, and was being monitored by a psychiatrist. *See id.* at 678, 686 n. 17. Respondent also testified that he was willing to submit to monitoring by a practice monitor and to mentoring on ethical issues. *Id.* at 678. Because the imposition of discipline is intended not to punish the attorney but to protect the public, these facts, though not necessarily pertinent to rehabilitation, are relevant to a determination of whether a sanction less than disbarment may be appropriate in this case. *See Temple,* 596 A.2d at 591 ("[d]isciplinary sanctions are not imposed as punishment, but as a means of assuring the attorney's fitness to practice and for protecting the public from misconduct by attorneys which may cause harm") (citation omitted).

On the other hand, the Board's Report states that "although suspended[,] Respondent appears to have signed papers in a Superior Court case and federal bankruptcy proceedings...." Board Report at 16. For this reason and possibly others, whether Respondent can demonstrate that he is rehabilitated remains a serious question that is appropriately considered by the Board in the first instance.

In determining whether a mitigated sanction is warranted, the Board will also

need to take into account the absence of any finding by the Maryland court that Respondent's depression or other disorders caused or affected his misconduct in regard to the Patterson bankruptcy matter. While a mitigated sanction may be warranted for Respondent's misappropriation of client funds and related violations (*e.g.,* his dishonesty toward medical care providers who were awaiting payment from settlement proceeds), the Board will need to determine whether there is any basis for mitigation as to his dishonesty in withholding information from the bankruptcy trustee and (whether or not mitigation is warranted) what sanction is appropriate in light of that misconduct. *Cf. Verra,* 932 A.2d at 504, 2007 D.C.App. Lexis 484, *5 (holding that a stay of disbarment was warranted as to misappropriation of client funds because of Verra's depression, but that because Verra had not shown that her impairments affected her misrepresentations and other misconduct *vis a vis* Bar Counsel's investigation, a thirty-day suspension was warranted).[22]

■ Before concluding our analysis, we must address the Board's suggestion that, under our case law, *Kersey* mitigation is not available in cases involving intentional dishonesty. *See* Board Report at 13 n. 7. We have never adopted such a *per se* rule. To the contrary, as we said in *Appler,* 669 A.2d at 738, "we have recognized certain situations where the most egregious misconduct may qualify for mitigation"; *see also Reid,* 540 A.2d at 759 ("[t]he sanction

---

22. Respondent's dishonesty, standing alone, presumably would warrant a less severe sanction than the sanction (disbarment) that generally is warranted for misappropriation of client funds. *See, e.g., Reback,* 513 A.2d at 231, 233 (imposing a suspension of six months for "false signing, notarization, and filing of a pleading," "serious conduct" that was dishonest, prejudicial to the administration of justice, and "plainly intolerable").

But here, it may be appropriate to treat Respondent's dishonesty as an "aggravating factor." *In re Pierson,* 690 A.2d 941, 950 (D.C. 1997). If the Board determines that a mitigated sanction is warranted for Respondent's misappropriation of client funds, it will need to determine whether some offset to mitigation is warranted for Respondent's dishonest conduct.

imposed in *Kersey* did not necessarily turn on the egregiousness of the conduct at issue there"). Notably, the mitigated sanction that we imposed in *Kersey* (disbarment, with a stay of execution and a five-year period of conditional probation) was for "a widespread and persistent pattern of violations" that included "commingl[ing] client funds and [ ] us[ing] them for [Kersey's] own purposes." 520 A.2d at 324.

■ Bar Counsel correctly notes that, in several cases involving intentional misappropriation of funds, we concluded that *Kersey* mitigation was not warranted.[23] However, just as often, we have applied *Kersey* mitigation to reduce the sanction for impaired lawyers' misappropriation of client funds. *See, e.g., Verra*, 932 A.2d at 503–04, 2007 D.C.App. Lexis 484, *1–2, 5 (D.C.2007) (during her representation of a client in connection with an automobile accident, Verra held funds belonging to the client in her personal bank account, overdrew the account before the client received

her funds and eventually wrote a check to the client on insufficient funds, and failed to pay the client's medical bills arising from the accident; we stayed disbarment and placed Verra on conditional probation for misappropriation of client funds, accepting the Board's finding that Verra had demonstrated a causal relationship between her depression and her misconduct); *In re Mooers*, 910 A.2d 1046 (D.C.2006) (Mooers allowed the amount in his trust account to fall below the amount owed to a client's medical providers and acknowledged having used funds in the account for personal and business expenses; we accepted the Board's determination that Mooers suffered from major depression (caused by an acrimonious divorce and custody proceeding) and that his misconduct would not have occurred but for his depression, and followed the Board's recommendation that we disbar respondent but stay the disbarment and impose a three-year period of conditional probation); *In re Cappell*, 866 A.2d 784 (D.C.2004) (Cap-

**23.** *See, e.g., In re Ayeni*, 822 A.2d 420 (D.C. 2003) (Ayeni transferred client funds to his own account that he used for both personal and operating expenses and used one client's funds to cover a delinquency in another client fund; we disbarred him, agreeing that he had "failed to provide clear and convincing evidence that his impairment [alcoholism] substantially caused his misconduct and that he has been rehabilitated"); *Marshall*, 762 A.2d 530 (Marshall settled a client's case and then used the proceeds to purchase crack cocaine as well as to pay personal expenses, paying the client only after the client filed a complaint with Bar Counsel, lying to the client and to third-party health care providers about why they had not been paid, and fabricating checks purporting to show payments to third party medical providers; we reasoned that Marshall's addiction "stem[med] from his unlawful possession, use, and abuse of cocaine over a period of several years," *id.* at 537, and that "[t]o apply a mitigation principle previously used only in connection with lawful conduct to a situation involving criminal behavior distorts that principle beyond recogni-

tion," and we held that "where an attorney's misconduct warrants disbarment, addiction to cocaine attributable to the intentional use of that drug does not warrant the imposition of a lesser sanction"); *Stanback*, 681 A.2d 1109 (Stanback withdrew $8,000 from a client trust account and used it towards payment of his office rent; we disbarred him, agreeing that he had failed to prove that he was suffering from alcoholism or depression at the time he misappropriated his clients' funds); *In re Woodard*, 636 A.2d 969, 976 (D.C.1994) (Woodard "intermingled improper withdrawals of clients' funds with numerous appropriate deposits and withdrawals of funds" and "used other funds to restore amounts in escrow accounts, ... 'borrowing from Peter to pay Paul'"; we accepted the Board's finding that Woodard had failed to prove that his addiction substantially affected his professional conduct, noting specifically that the physician who testified that the primary cause of Respondent's misconduct was "drug ingestion and the toxicity" had "not read the complaints or the specifications of charges against Respondent").

pell collected monies for his clients but failed to pay outstanding medical providers' bills for some months thereafter, using the funds instead for personal and business expenses; a hearing committee found that the misconduct would not have occurred but for Cappell's major depression, which was caused by the breakup of his marriage and significant health problems, and we accepted the Board's recommendation that we disbar respondent but stay the disbarment and impose a three-year period of conditional probation); *Larsen*, 589 A.2d at 402 (a reciprocal discipline matter in which we relied on findings by the Maryland Court of Appeals that Larsen "collected a check from an insurance company in the amount of $2,050 to reimburse the physician's medical charges" and "instead of paying the money to the physician, ... used the funds for his own purposes," and that Larsen's misconduct resulted from his bipolar or manic depressive disorder and that respondent could practice law responsibly and professionally with treatment and support; we disbarred Larsen but stayed the disbarment and imposed a period of conditional probation); *Reid,* 540 A.2d 754 (Reid settled a client's claim but deposited the proceeds in his personal checking account and then misrepresented to his client the amount of settlement and failed to pay the client's medical bills; noting that Reid's alcoholism was the proximate cause of his misconduct, we disbarred him but stayed the execution of disbarment, and we placed him on probation for a period of five years subject to conditions recommended by the Board). As these cases demonstrate, a sanction less an absolute disbarment, such as an order of disbarment stayed during a period of conditional probation, may be an appropriate sanction for Respondent's intentional misappropriation if there is clear and convincing evidence of rehabilitation. We cite these cases not to suggest a sanction, but merely to illustrate the range of discipline that has been imposed when mitigation was found to be appropriate.

Accordingly, for the foregoing reasons, we accept the recommendation of the Board that we impose reciprocal discipline on Respondent Robert Joel Zakroff. We defer judgment on the recommendation that Respondent be disbarred and instead remand the matter to the Board for a determination of (1) whether Respondent can demonstrate by clear and convincing evidence that he has been substantially rehabilitated and that, for his misappropriation of client funds, a sanction lesser than immediate disbarment is appropriate (and, if so, what lesser sanction is appropriate); and (2) how Respondent's misconduct in connection with the *Patterson* bankruptcy matter should impact the sanction to be imposed. *See* Rule XI, § 11(f)(2) ("If the Court determines that the identical discipline should not be imposed, it shall enter such order as it deems appropriate, including referral of the matter to the Board for its further consideration and recommendation").

*So ordered.*